In re MERRIMACK VALLEY OIL CO., INC., Thomas F. Fay, Jr., Oil Sales, Inc., The Fay Group, Inc., Thomas F. Fay, Jr., and Mary B. Fay, Debtors.

Bankruptcy Nos. 81–2087–JG, 81–2088–JG, 81–2089–JG and 81–2338–JG.

United States Bankruptcy Court, D. Massachusetts.

Aug. 3, 1983.

Mark N. Berman, Widett, Slater & Goldman, P.C., Boston, Mass., for debtor.

Robert C. Gerrard, Boston, Mass., for objecting creditor.

Peter Zimmerman, Silverman & Kudisch, Boston, Mass., for creditors' committee.

## DECISION IN THE MATTER OF THE REQUEST FOR AN ORDER CONFIRMING THE DEBTORS' FIRST AMENDED PLAN OF REORGANIZATION

JAMES N. GABRIEL, Bankruptcy Judge.

This matter arises out of the application for confirmation of the Chapter 11 plans proposed by these five jointly administered debtors. At the hearings on confirmation the Court received into evidence the testimony of the individual debtor Thomas Fay, also the principal officer of the corporate debtors, the testimony of two accountants, as well as supporting exhibits. There was substantial cross-examination of the witnesses as well as contradictory testimony by the objecting party's accountant and exhibits received in support of and in opposition to the confirmation of the debtors' plan.

There were also oral statements of counsel and post-hearing briefs submitted.

### Findings Of Fact

The five debtors in these cases are: Thomas F. Fay, Jr., Oil Sales, Inc. ("Fay Oil"), Merrimack Valley Oil Co., Inc. ("Merrimack") The Fay Group, Inc. ("Fay Group"), and Thomas F. Fay, Jr. and Mary B. Fay, husband and wife ("The Fays"). The three corporations filed voluntary Chapter 11 petitions on November 18, 1981. The Fays filed on December 30, 1981.

Fay Oil, the parent company, is engaged in the wholesale purchase and sale of industrial and home heating oil in North Andover, Massachusetts. Merrimack, a wholly-owned subsidiary, is a retailer of home heating fuel in North Andover. The other wholly-owned subsidiary, the Fay Group, buys, sells, raises and races standard-bred horses. The Fays, husband and wife, reside in Windham, New Hampshire.

Since the commencement of these cases, the debtors have operated their businesses as debtors-in-possession. They have incurred substantial losses and approximately $400,000 in post-petition debt that is entitled to priority pursuant to 11 U.S.C. Section 503. Approximately $390,000 of the post-petition indebtedness represents new purchases of oil from Global Petroleum Corporation ("Global") which has extended the oil company debtors a line of credit of $500,000. The indebtedness to Global is secured by a security interest in all assets of the debtors.

The debtors' major unsecured creditor is Belcher New England, Inc. ("Belcher"), a former supplier, which alleges it is owed approximately two million dollars for goods sold and delivered and opposes confirmation of the debtors' plan.

The debtors' consolidated First Amended Plan of Reorganization ("Plan"), filed on October 5, 1982, provides for a thirty-five per cent (35%) dividend to unsecured creditors, to be paid over three years, and an extra five per cent (5%) to Belcher. Administrative expenses ($157,000) are to be paid on confirmation together with a five

per cent (5%) dividend to unsecured creditors ($159,700) and a partial tax dividend ($20,875) for a total $447,575. For the next two years the debtors must pay $339,400 each year in cash on the anniversary of confirmation. The third deferred payment is to be combined with a bonus of $136,350 to Belcher for a required fourth payment of $475,750 on the third anniversary of confirmation. Total payments required under the plan are $1,492,125 assuming that all claims are allowed in full.

The debtors' disclosure statement and plan and ballots were sent to creditors and a hearing on acceptances and confirmation was scheduled for December 16, 1982. At this time the debtors objected to the claims of Belcher and sought to disqualify Belcher from voting because its three proofs of claims totalling two million three hundred thousand dollars ($2,300,000) were undocumented, and because Belcher's votes rejecting the plan were in bad faith. After an examination of the proofs of claims, argument of counsel for both parties, and review of the applicable Rules of Bankruptcy Procedure, the Court disallowed Belcher's claims for voting purposes only.

Having disqualified the votes of Belcher, it appeared that the requisite number of acceptances was present, and the Court conducted the hearing on confirmation.

### Best Interest Of Creditors Test:

One prerequisite of confirmation is that creditors receive as much under the plan as they would under a Chapter 7 liquidation. Unless there is unanimous acceptance of the plan by each member of each class, the Court must find that each creditor:

"... will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of this title on such date;"

11 U.S.C. Section 1129(a)(7).

The liquidation values are found to be as follows:

| | |
|---|---|
| Cash | $ 310,900 |
| Inventories | 63,600 |
| Real Estate—Business | 100,000 |
| Real Estate—Residential | 340,000 |
| Transportation Equipment | 294,000 |
| Furniture and Fixtures | 10,000 |
| Race Horses | 173,000 |
| Accounts Receivable | 282,400 |
| Other Assets | 14,000 |
| TOTAL NET REALIZABLE VALUE | $1,587,900 |

The value of goodwill and customer list is found to be highly speculative in the light of the restrictions and covenants required for their sale to be of any consequence.

The secured and priority claims are as follows:

| | |
|---|---|
| Notes and mortgages | $ 126,100 |
| Chapter 11 fees and expenses | 157,500 |
| Priority claims under Chapter 11 | 113,100 |
| Post-filing debt | 394,900 |
| Estimated Chapter 7 expenses | 160,000 |
| TOTAL | $ 951,600 |

The net amount available on liquidation is therefore $636,000 or approximately twenty per cent (20%) of unsecured debt of $3,193,975.

The plan provides for thirty-five per cent (35%) to unsecured creditors and forty per cent (40%) to Belcher for its allowed claim. The present value of said payments is twenty-nine per cent (29%) (32% to Belcher). In liquidation, payment would not be made for at least six months of conversion to Chapter 7 because creditors have six months to file proofs of claims pursuant to Bankruptcy Rule 302(e). Secured creditors and administrative claimants are not impaired under the plan. Accordingly, I find that the debtors' plan which offers creditors 35% to 40% over three years, which amounts to a present value of 29% to 32%, is in the best interests of creditors, and complies with the requirements of 11 U.S.C. Section 1129(a)(7).

### Feasibility

The next issue is the debtors' compliance with U.S.C. Section 1129(a)(11) which obliges a Court to find that:

"confirmation of the plan is not likely to be followed by the liquidation, or the

need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation is proposed in the plan."

The purpose of this requirement, which was adopted from the 1898 Bankruptcy Act's requirement of feasibility, is to ensure that the plan offers a reasonably workable prospect of success and is not a visionary scheme. *In re Landmark At Plaza, Ltd.,* 8 B.C.D. 1363, 7 B.R. 653 (Bkrtcy.D.N.J.1980). In determining whether a plan passes the feasibility test, the Court should consider (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; and (4) the ability of management. *L. King, 5 Collier on Bankruptcy,* Par. 1129.02 (15th ed. 1982 Supp.).

■ Where a debtor proposes to fund a plan out of operating revenue, its financial record during the pendency of the Chapter 11 is probative of feasibility. *See In re Northern Protective Services, Inc.,* 8 B.C.D. 1363, 19 B.R. 802 (Bkrtcy.W.D.Wash.1982); *In re Western Management, Inc.,* 6 B.R. 438 (Bkrtcy.W.D.Kentucky 1980). Income projections indicating financial progress must be based on concrete evidence of financial progress, and must not be speculative, conjectural or unrealistic predictions. *In re Stuart Motel, Inc.,* 8 B.R. 48, 7 B.C.D. 54 (Bkrtcy.S.D.Fla.1980).

■ In the present case the debtors intend to make their payments from the income of the three companies and if they fall short on any payment, they will liquidate the amount of assets necessary to make any payment.

The plan proposes the following repayment schedule:

| | |
|---|---|
| On confirmation | $337,575 |
| First anniversary | 339,400 |
| Second anniversary | 339,400 |
| Third Anniversary | 475,750 |
| Total | $1,492,125 |

It is undisputed that the debtors have no commitment for financing except the line of credit of $500,000 for purchases of oil. The reorganized debtors will have only horses—worth $173,000—and the oil company's fixed assets—vehicles and equipment worth $300,000—to serve as collateral. The debtors intend to grant a $250,000 mortgage on their home to the creditors' committee. Both accountants attested to the difficulties the reorganized debtors would have in obtaining financing. In addition, the lack of any present commitment precludes reasonable reliance on financing as a method of funding the plan. In addition, to the extent additional financing is necessary, even if available, the debt service required would be an additional drain on cash flow.

There is no doubt that the debtors can meet the first payment on confirmation from the cash on hand which was raised by the simple expedient of creating post-filing secured debt from the principal supplier, Global, which is, in effect, a funder, rather than a source of working capital. However, I am unable to accept that the debtors' projections are reliable.

Historically, the previous five years of operation of the debtors amounted to losses totalling $325,000 as follows:

| Fiscal Year Ended | Sales | Net Income or (Loss) |
|---|---|---|
| September 30, 1978 | $12,071,000 | $ 9,000 |
| September 30, 1979 | 17,088,000 | 9,000 |
| September 30, 1980 | 23,907,000 | 64,000 |
| September 30, 1981 | 36,763,000 | (226,000) |
| September 30, 1982 | 8,757,000 | (181,000) |

The debtors' projections seek to establish that there will be a profit for the fiscal year ended September 30, 1983, of $79,150 plus an additional profit for the quarter ended December 31, 1983 of $28,700 or a total profit of $107,800 for the fifteen-month period. To this amount the debtors seek to add all of the depreciation expense of $277,200 for this fifteen-month period as a source of funds to meet the payment schedule of the plan.

The depreciation during this period is as follows:

| | |
|---|---|
| Race Horses | $110,400 |
| Motor Vehicles, etc. | 111,900 |
| Total | $222,300 |

While the debtors point to the depreciation as a source of funds to meet the payments due, the total of net profit plus de-

preciation or gross cash flow of $301,450 is still $37,950 short of the $339,400 due in each of the next two years and $174,300 short of the final payment of $475,750. Thus, there is an initial shortfall of $250,200 before taking into account the cash requirements for replacement of race horses and motor vehicles, increases in accounts receivable and inventories (especially at peak season), and the servicing of mortgage debt on the personal assets as well as the other advances to the principal officer. Although the debtors' various assets have a limited life, the debtors project no expenditures for any purchases of trucks, horses or equipment which must be replaced. The projections do not provide a cushion for contingencies or extraordinary expenses which will necessarily be required by virtue of the wasting nature of the assets. Furthermore, the debtors' failure to include costs for replacement of assets is inconsistent with Thomas Fay's testimony that he took withdrawals of $69,000 in 1982 to purchase horses for the Fay Group. Expenditures for replacement of fixed assets must be contemplated, but no such expenditures are included in any of the projections. Without expenditures for such purchases the projections cannot be considered reliable.

A critical flaw in the debtors' projections is their blanket extension of their projections for the period for September 1982 to December 1983. Forgetting that this period covers fifteen months, debtors use the fifteen month figures to cover each subsequent year of operations without any basis. Moreover, using the first fifteen months projections for the subsequent years ignores any inflation factor, which should be included. While on the subject of the economy, it should be noted that any projections in the businesses of these debtors must be suspect in view of the unstable nature of the oil market, both in terms of cost and consumption, and in view of the unpredictability of profit in the horse racing business.

The debtors inappropriately intend to use all of their accumulated operating surplus to pay the extra five percent to Belcher at the time of the final plan payment. Even assuming that each year the debtor will have $60,000 remaining working capital surplus, the debtors will likely have to use the surplus to fund their operations, and cannot totally rely on the existence of the surplus to pay Belcher.

A further defect in the debtors' projections is that the projected cost of sales are at variance with the debtors' historical costs. The debtors use 92% of gross as the cost of sales, asserting that they have cut costs by $175,000 during the Chapter 11, which approximates two per cent. Historically, debtors' costs of sales have been 97% of gross. Thus, according to their own evidence, a more accurate percentage of cost of sales is 95%. The costs of sales substantially affect the projections because a one percent increase in costs of sales means a $100,000 decrease in annual net income. Thus assuming the accuracy of debtors' projections in all other respects, but using a 95% cost factor the debtors' projections would not show $64,000 in net income, but rather would show a $250,000 loss. In view of the debtors' own evidence that costs of sales have been historically 97%, and have been reduced by one and three quarters per cent, I find that the use of 92%, as cost of sales is improper, and that the projections based on this cost percentage are inaccurate.

Belcher's main objection to debtors' projections of profitability is that the projections conflict with debtors' losses during the pendency of this case. The debtors do not dispute that they have not operated profitably during this period. Mr. Fay admitted that on a consolidated basis debtors have sustained losses during their tenure as debtors in possession, the extent of which is unknown. In my view, a debtor's financial progress or lack thereof, while under the protection of Chapter 11, is an indicator of the debtors' fate. Unfortunately, for an unknown reason, the debtors neglected to produce actual profit and loss figures for the period from June through December 1982. For the eight months ending May 1982 we do know that the consolidated debtors had net losses of $138,000. Belcher's accountant demonstrated that from

June to September 1982 the debtors lost $33,000, whereas they had projected $16,000 in net income for this period. Therefore it is not unreasonable to conclude that debtors' have lost over $100,000 during this Chapter 11. Moreover, debtors' projected gross sales figures for June to September 1982 do not comport with actual sales for the same period. Sales were $185,000 less than projected.

The net profit figures projected for the three months ended September 30, 1982 of $18,650 are to be compared to the loss of $42,456 for the four month period from June 1, 1982 through September 30, 1982. No sales or actual figures were submitted to compare with the projected profit of $6,800 for the subsequent quarter ended December 31, 1982. The debtors chose not to produce any actual net income figures for the fourth quarter 1982 simply relying on the fourth quarter projection. Although the confirmation hearing was held in early January 1983, and debtors' counsel asserted that the actual figures for the fourth quarter were not available, I must draw a negative inference from the failure to produce the third quarter figures and at least some of the financial information for the fourth quarter 1982. The debtors have been unable to show a positive cash flow during this Chapter 11 bearing any resemblance to the projections, despite the claims of decreased expenses. In contrast, nothing in the debtors' recent financial progress during reorganization, and in view of the unreliability of the projections, it is impossible to find that the debtors will be able to execute their plan with operating revenues.

As an alternative, the debtors propose to sell certain assets to satisfy any shortage should revenues be insufficient. I am not convinced of the adequacy of this proposal. The debtors' total liquidation value at present is $636,000. This does not even consider the blanket security interest of Global in all assets of the debtor to secure the $500,000 line of credit for business operations. Borrowings to date are in the amount of $380,000, and the companies intend to use the full line of credit. Thus, realistically, we must decrease the liquidation value by a figure ranging from $300,000 to $500,000, leaving a true liquidation value of somewhere from $136,000 to $336,000. The plan's payment requirements are over $1,100,000. Even assuming the first payment can be made from cash on hand, there still must be paid over $800,000 over the next two years.

In view of these facts, the debtors' reliance on *In re Nite Lite Inns,* 17 B.R. 367 (Bkrtcy.S.D.Cal.1982) is misplaced. Although the Court in *Nite Lines* found the plan feasible because it was supplemented by a liquidation proposal, the value of the debtors' assets exceeded the amount to be paid under the plan. *In re Nite Lite Inns,* 17 B.R. at 370. In the present case the alternative of liquidation is not comparable to that approved by the Court in *Nite Line* because here the value of assets is far less than the deferred payments promised over the duration of the plan.

The success of the liquidation alternative is unpredictable as the amount of the shortfall on each deferred payment is unknown. Neither party's projections reliably estimated the shortfall. Debtors predicted no shortfall, but a review of their accountant's testimony supports the conclusion that based on the projections the shortfall could be $200,000 per deferred payment. Belcher's projections were defective in that they contained duplicate expenses for hauling. Thus, the amount of the shortfall is not known. The Court can only look to the debtors' estimated $100,000 loss during the Chapter 11 which compels the conclusion that the shortfall could easily range in the vicinity of $300,000. Clearly assets capable of being liquidated do not approach this amount in view of the Global Security interest.

In response to the assertion that assets could be liquidated to effectuate the plan, it must be noted that all assets are fully pledged and there can be no assurance that the proceeds would be available to unsecured creditors. With the sole exception of the residences, a disposition of race horses or motor vehicles would certainly have an

adverse effect on the operating results as projected and unduly restrict future operations and profitability.

Moreover, the evidence supports the conclusion that the assets debtors intend to liquidate are not readily saleable. Mr. Fay has been attempting to sell the oil company trucks, which have a value of somewhere between $259,000 and $279,000 for over a year without success. Moreover, there was evidence that the horses' value has decreased and will continue to decrease with age. It is unreasonable for debtors to rely so heavily on liquidation of these assets.

In summary, this Court is of the opinion that the debtors' plan in its present form puts creditors at considerable risk. The projections are not reliable, and do not form a basis for finding feasibility. The liquidation alternative does not guarantee creditors what the debtors have promised. The Court has serious concerns that these debtors will require further reorganization if this plan is confirmed. Accordingly, it is my conclusion that the plan fails to meet the requirement of confirmation set forth in 11 U.S.C. Section 1129(a)(11) and confirmation of the debtors' plan is hereby denied.