**In re ADAMSON COMPANY, INC., et al., Debtors.**

**Bankruptcy No. 83–00725–R.**

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

Aug. 9, 1984.

William Schwarzschild, Richmond, Va., for debtors.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter came before the Court for a hearing on the debtors' modified plan of reorganization ("plan") and on the objection to confirmation filed by Irving Leasing Corporation ("Irving"). After consideration of the debtors' modified plan and the evidence presented by the debtors and Irving during the confirmation hearing, this Court renders the following findings of fact and conclusions of law.

## PROCEDURAL BACKGROUND

1. The debtors filed for relief pursuant to Chapter 11 of the Bankruptcy Code on May 3, 1983.

2. The debtors' initial plan of reorganization and disclosure statement was filed on March 1, 1984. An amended disclosure statement was filed on April 26, 1984.

3. An amended plan of reorganization and second amended disclosure statement was filed on May 2, 1984. After a hearing on May 1, 1984, an order approving the second amended disclosure statement was entered by this Court on May 3, 1984.

4. Confirmation of the amended plan of reorganization was denied by order of this Court entered June 26, 1984 after finding that the amended plan did not treat the claim of Irving Leasing in a fair and equitable manner.

5. The debtors filed a modified plan of reorganization on July 2, 1984. A hearing on confirmation of said modified plan was held on July 31, 1984 and oral argument was heard by this Court on August 1, 1984.

## STATEMENT OF FACTS

6. Since filing Chapter 11 the debtors have had approximately $14 million in sales, approximately $350,000 of profit including extraordinary gains from the sale of idle assets, however, the debtors were not required to make full debt service payments during the pendency of the Chapter 11 proceeding. Since the first confirmation hearing on the debtors' plan of reorganization the debtors have generated $138,000 profit of which approximately $80,000 was extraordinary gain.

7. The upper and the middle management of the debtors has remained constant and optimistic during the Chapter 11 proceedings, having lost only one employee, a credit manager, during the course of the proceedings.

8. The debtors have received $830,000 from the Pension Benefit Guaranty Corporation as a reversion from a cancelled pension plan. (See Plaintiff's Exhibit #3).

9. Due to the debtors' extraordinary legal fees and other administrative expenses its normal operating costs have been greater in Chapter 11 than such expenses would have been otherwise.

10. Jerry D. Davis, president of the debtors, testified that the recent months of operation have been promising and that the future looks similarly good for the company. In addition, he testified that potential legislation requiring double-walled fuel tanks may create additional opportunities for the company's business prospects and that customer confidence and marketing of the debtors' products will increase substantially if the stigma of operating under Chapter 11 is removed by obtaining confirmation of a plan of reorganization.

11. The debtors have approximately $3 million of backlog orders.

12. The debtors have streamlined their operations by closing inefficient or unnecessary manufacturing plants, by concentrating on more profitable product lines, and by selling excess property and equipment.

13. The money received as a pension reversion was paid to the BVA Credit Corporation (BVA) to reduce interest expenses on the debtors' line of credit with BVA. The $830,000 is readily available to the debtors and may be withdrawn if confirmation is obtained in order to meet immediate and long-term cash needs.

14. The existing line of credit that the debtors have with BVA which has an interest rate of prime plus four points is currently available in the amount of $2.8 million and will be available for the foreseeable future. The arrangement is a "demand type" and BVA has no commitment to keep the line of credit available, however, Lawrence N. Ashworth, a representative of BVA, testified that there appeared to be no foreseeable reason to call the loan.

15. The value of the collateral securing Irving's claim is approximately $550,000 if the collateral was liquidated in an orderly manner. The value of that same collateral is approximately $400,000 if it was liquidated at an auction sale.

16. Based upon collateral valued at $550,000 Irving will receive under the plan, payments that are equivalent to an effective interest rate of 19.23%. Based upon collateral valued at $400,000 Irving will receive under the plan, payments that are equivalent to an effective interest rate of 29.56%. (See Plaintiff's Exhibit #6).

17. The current rate of interest for equipment financing or equipment leasing is approximately 15 to 17 percent.

18. Jean-Louis Pierson, an assistant vice president for Irving, testified that a) the industry in which the debtors are in-

volved is one in which it is very difficult to make money; b) that the industry is one in which the average debt-to-equity ratio of the parties in that industry is low, approximately 1.4; c) that the debtors' debt-to-equity ratio is approximately 5, and that such leverage is exceedingly high for the industry in which the debtors participate; d) that based upon the monthly profit and loss statements filed by the debtors, the debtors will be unable to have sustainable cash flow to meet the debt service contemplated by the reorganization plan; and e) that because of these various reasons the debtors' plan of reorganization is not feasible and is likely to be followed by further reorganization.

19. Mr. Pierson's testimony was based in part upon the 1984 U.S. Industrial Outlook, a government publication (*see* Defendant's Exhibit #2), and the Robert Morris Associates survey of financial statements, both of which survey a variety of industries. More particularly, Mr. Pierson based certain conclusions about the debtors on information about a similar industry which was coded in the U.S. Industrial Outlook as 3444, however, Mr. Pierson admitted that the debtors are better classified as 3443. His reason for relying on the information about industry 3444 was that no information was available about the more appropriate classification of the debtor. (The industry coded 3444 by the U.S. Industrial Outlook manufactures products such as heating and air-conditioning ductwork, gutters and downspouts, and siding, whereas the debtors are involved with highly technical manufacturing of fuel tanks and pressure vessels.)

20. Howard B. France testified a) that the pressure vessel industry, of which the debtors are participants, did not have a good future; b) that various parties within the industry were pessimistic about any foreseeable upswing in business; c) that the extent to which the debtors are leveraged is excessively high considering the type of industry; d) that the salary being drawn by top management of the debtors was high for the amount of the corporation's volume; and e) that based upon the

testimony he observed during the confirmation hearing and from a cursory analysis of some exhibits previously provided to him he opined that although the debtors might possibly be successfully reorganized, such a reorganization was an uphill battle and would more probably be followed by a need for further reorganization.

21. In order to service the obligations treated by the plan, the debtors would need approximately $400,000 a year during the first five years to pay principal and interest; approximately $350,000 per year during the sixth and seventh years of the plan; and approximately $750,000 in year eight to pay the balloon payments which are due at that time.

22. The amount of debt to be serviced by the debtors' plan will be approximately half of the amount of the secured debt serviced by the debtors prior to the plan of reorganization.

23. If confirmation is obtained, the debtors will have a net worth of approximately $1.7 million and working capital of approximately $2 million.

24. The debtors projected that $60,000 per month could be generated post-confirmation as a means of satisfying the debt service requirements of the reorganization plan and the reorganized debtor. (*See* Plaintiff's Exhibit #13 and Second Amended Disclosure Statement § I(G) at 23–25). In addition, Jerry D. Davis, president of the debtors, testified that the projection of $60,000 per month as gross cash flow initially revealed in April, 1983, continued to be a valid average monthly estimate of the cash flow which the debtors could generate post confirmation.

25. Between June, 1983 and June, 1984 inclusive, which includes the time period in which the debtors operated their business under the protection of Chapter 11 of the Bankruptcy Code, the debtors generated sufficient gross cash flow to meet the plan projection amount of $60,000 per month more than half of the time. (*See* Defendant's Exhibit #1).

### CONCLUSIONS OF LAW

The issues relating to confirmation of the debtors' proposed plan were substantially reduced by certain preliminary motions made by the debtors and granted by this Court. First, the debtors moved that the Court adopt certain findings of fact made by the Court in its June 26, 1984 order which emanated after the initial confirmation hearing in this matter. No objection was taken to the debtors' motion and the Court granted said motion and adopted as findings in this proceeding the following:

1. The plan has been proposed in good faith and not by any means forbidden by law.

2. With the exception of § 1129(a)(8), § 1129(a)(11), and § 1129(b), the proponent of the plan has complied with the applicable provisions of Chapter 11.

3. Any payment made or promised by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan and incident to the case, has been disclosed to the Court; and any such payment made before confirmation of the plan is reasonable; or if such payment is to be fixed after confirmation of the plan, such payment is subject to approval of the Court as reasonable.

4. The proponent of the plan has satisfied fully the disclosure requirements of § 1129(a)(5)(A) & (B).

5. Section 1129(a)(6) is inapplicable to the debtors.

6. With respect to each class, each holder of the claim or interest of such class has accepted the plan; or will receive or retain under the plan on account of such claim or interest property of value, as of the effective date of the plan, as not less than the amount that such holder will receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date and that § 1129(a)(7) has been otherwise satisfied.

7. At least one class of claims has accepted the plan.

The debtors' second preliminary motion was to dismiss a portion of Irving's objection to confirmation. Irving objected to confirmation in part because it alleged that the plan failed to comply with the requirements of § 1129(a)(9) in that it alleged that priority creditors were not treated appropriately. The Court granted the debtors' motion holding that Irving did not have standing to object to the treatment of priority creditors. See In re Adana Mortgage Bankers, Inc., 14 B.R. 29, 30 (Bankr.N.D. Ga.1981). In addition, the Court finds that in accepting the debtors' plan of reorganization, priority creditors have agreed to a different treatment of their claims than that required by § 1129(a)(9). Therefore, § 1129(a)(9) has been satisfied.

Finally, the debtors moved to dismiss those portions of Irving's objection to confirmation relating to Bankruptcy Rule of Procedure 3019 as well as those relating to the debtors' failure to circulate a new disclosure statement with its modified plan. Irving withdrew its Rule 3019 objection and this Court, granting the debtors' motion to dismiss that portion of Irving's objection relating to the disclosure statement, ruled that no additional disclosure was necessary for the debtors' modified plan of reorganization.

After ruling upon these motions the issues before the Court were substantially reduced. In fact, the parties agree that the final three issues before the Court are 1) whether the plan discriminates unfairly; 2) whether the plan treats Irving in a fair and equitable manner pursuant to § 1129(b); and 3) whether the plan satisfies the feasibility requirements of § 1129(a)(11).

Irving offered little, if any, evidence on the issue of unfair discrimination, but in oral argument contended that inasmuch as it was receiving substantially more based upon its estimated secured claim relative to secured creditors in other classes, the latter were being treated unfairly. Based upon this argument it appears that Irving is arguing that the plan discriminates unfairly in its favor. This seems to be an issue more appropriately raised by the secured creditors other than Irving. Those

other secured creditors have not raised such an objection and in fact have filed acceptances to the debtors' plan. Consequently, because of insufficient evidence and the questionable standing of Irving to raise an objection because a plan unfairly discriminates in its favor, this Court rules that the plan does not discriminate unfairly as contemplated by § 1129(b)(1).

■ With regard to the second issue still before the Court the Bankruptcy Code provides that a class of creditors that does not accept the plan must be treated in a fair and equitable manner in order for the Court to confirm the plan notwithstanding that class of creditors' rejection of the plan. 11 U.S.C. § 1129(b)(1). Section 1129(b)(2)(A) sets out the following requirements with respect to a class of secured claims in order to find that a plan treats such creditors fairly and equitably:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the lien securing such claims, whether the property subject to such lien is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the lien securing such claims, free and clear of such lien, with such lien to attach to the proceeds of such sale, and the treatment of such lien on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A). With respect to the instant matter the relevant portion of § 1129(b)(2)(A) requires that Irving retain its lien and receive deferred cash payments with a value equal to the allowed amount of Irving's claim as of the effective date of the plan.

The plan clearly provides that Irving will retain its lien on collateral securing its claim. (*See* Modified Plan of Reorganization § 5.03–2(a)(I)). Therefore, this Court can find that Irving is treated in a fair and equitable manner if the payments proposed under the plan will provide to Irving a value equal, at least, to the allowed amount of its claim.

Testimony established that the value of the collateral securing Irving's claim at the time of confirmation is approximately $550,000 and may be as little as $400,000. The plan provides that for purposes of confirmation, Irving will receive no less than $903,453.51 reduced by the payments made to Irving from the sale of surplus machinery and equipment following the petition date, plus 11% per annum interest on that amount. The parties agree that the approximate amount of that claim is now $739,000.

Based upon the ten year amortization of the $739,000 claim paid over seven years with the final three years of amortization paid at the end of the seventh year in a balloon payment at 11% per annum interest, Irving will receive an effective return of 19.23% on its approximate secured claim of $550,000. Moreover, if the amount of the collateral securing Irving's claim is as little as $400,000 then the return on Irving's claim would be 29.56%. The current return for equipment financing or equipment leasing is between 15% and 17%, the federal judgment rate is currently 11.93%, and the current prime rate is 13%. Based upon these considerations this Court can and does find that a return of at least 19% satisfies the requirement that Irving receive on account of its claim, deferred cash payments totalling at least the allowed amount of such claim of a value of the effective date of the plan of at least the value of Irving's interest in the estate's interest in the secured property. *See* 11 U.S.C. § 11-29(b)(2)(A)(i)(II); *see also In re Barrington*

*Oaks General Partnership,* 15 B.R. 952, 956 (Bankr.D.Utah 1981).

■ Having found that the plan treats Irving in a fair and equitable manner and does not unfairly discriminate, this Court is left with the final issue of whether the debtors' plan is likely to be followed by liquidation or the need for further financial rehabilitation. *See* 11 U.S.C. § 1129(a)(11). This final requirement addresses whether the debtor's plan is feasible.

> Basically, feasibility involves a question of the emergence of the reorganized debtor in a solvent condition and with reasonable prospects of financial stability and success. It is not necessary that success be guaranteed, but only that the plan present a workable scheme, organization, and operation from which there may be a reasonable expectation of success.

5 Collier on Bankruptcy ¶ 1129.02 at 1129–33 (15th ed. 1981) (citing 6A Collier on Bankruptcy ¶ 11.07 at 235 (14th ed. 1978)). Among the factors relevant to determination of whether the debtors' plan of reorganization is feasible are the adequacy of the capital structure, the earning power of the business, economic conditions, the ability of management, and the probability of a continuation of the same management. *Id.* at 1129–34, –35, *see, e.g., In re Merrimack Valley Oil Co., Inc.,* 32 B.R. 485, 488 (Bankr.D.Mass.1983).

■ The parties have sharply disputed what the debtors' capital structure will be upon confirmation and the effect of that structure or the feasibility of the debtors' plan. Irving argues that the estimated net worth of the debtors assuming confirmation will be approximately $1,237,000 which would give the debtors a debt-to-equity ratio of 5.1. (*See* Defendant's Exhibit #5). This analysis done by Irving, however, is flawed. First, Irving subtracted the gain on fixed assets from the net worth. Although such gain is not reoccurring, for purposes of a net worth analysis it is an entirely appropriate factor to be included in net worth. In addition, Irving erroneously assumed that the amount of the unsecured

creditors' contribution to the debtors' net worth (in essence a "forgiveness" by unsecured creditors of a percentage of the debtors' obligations to those creditors) would be 60% of the proofs of claims filed rather than the proper amount which is 60% of *all unsecured debt* (not limited by unsecured debt represented by proofs of claims) that the debtors had at the time of filing. If these corrections are made to Irving's analysis of the debtors' net worth after confirmation, the debtors' net worth will be approximately $1,704,000, which is approximately ½ million more than Irving argued. Moreover, with this correction to the proper amount of the debtors' net worth the true debt-to-equity or debt-to-net worth ratio assuming confirmation would be 2.47. In addition, it appears that if the debtors' plan is confirmed the debtors will have over $2 million in working capital and a continuing line of credit of $2.8 million.

Irving argued that confirmation should be denied because of a lack of projections as to how the debtors intended to carry out their plan of reorganization. Although the Court believes the debtors could have provided Irving with more specific projections, the Court finds that the debtors have not failed to provide adequate projections for purposes of confirmation. As early as April, 1983, the debtors provided to Irving as well as other creditors projections of income, expenses, debt service, and anticipated cash flow. (*See* Plaintiff's Exhibit #13). It was these projections upon which the debtors based their plan of reorganization and to which the president of the debtors testified he referred Irving whenever Irving requested information about projections. Moreover, these projections are the same projections that the debtors outlined in their second amended disclosure statement which was approved by this Court. (*See* Second Amended Disclosure Statement I(G) at 33–35). With these observations in mind, the Court finds that for purposes of § 1129(a) adequate projections of the debtors' operations were provided to their creditors.

In addition, the Court cannot find that the debtors' projections are unreasonable. The debtors, while operating in Chapter 11, have been able to generate for a number of months, a sufficient cash flow to meet the projected cash flow requirement of $60,000. Considering that the debtors' marketing may improve upon confirmation and the unusually high expenses associated with doing business under Chapter 11 will decline, it is reasonable to expect that in the months following confirmation the debtors will be able to meet the projected cash flow requirements with regularity. Thus, the income projections in light of the debtors' past profit and loss performance are not speculative or conjecture, *see In re Merrimack Valley Oil Co., Inc.*, 32 B.R. 485 (Bankr.D.Mass.1983); *In re Stuart Motel, Inc.*, 8 B.R. 48 (Bankr.S.D.Fl.1980), but rather are reasonably probative of feasibility. *See In re Merrimack Valley Oil Co., Inc.*, 32 B.R. 485 (Bankr.D.Mass.1983); *In re Northern Protective Services, Inc.*, 19 B.R. 802 (Bankr.W.D.Wash.1982).

In addition to Irving's concern about inadequate projections, Irving argued that the debtors' plan of reorganization is not feasible because of the industry in which the debtors do business. Witnesses for Irving testified that the debtors' industry is one in which a low debt-to-equity ratio prevails, that expansion of the available markets in the debtors' industry does not appear likely in the future, that the debtors' industry is one in which it is very hard to make a profit, and that the debtors are far too leveraged to succeed in the industry. Irving's testimony in this regard is flawed inasmuch as its witnesses were never able to directly tie the industry statistics upon which they based their conclusions to the debtors' industry. Rather, the leverage figures and future business prospects about which Irving's witnesses testified were related to industries that are markedly distinct from the debtors' actual operations. Although Irving argued that the figures were applicable because they were of analogous industries, the Court holds that in this regard Irving failed to present convincing evidence that the statistics should be applied to the debtors in this matter. Consequently, the Court does not have before it the appropriate debt-to-equity ratio for a business in the debtors' industry.

Howard B. France, the expert witness who testified for Irving, admittedly based his opinion largely upon the evidence presented at the confirmation hearing and upon certain financial data provided him. As stated above some of the testimony (Mr. Pierson's) upon which he based his opinion was either flawed or largely inapplicable to the debtors. Moreover, as earlier discussed by the Court, some of the figures regarding the debt-to-equity ratio and the debtor's net worth were improperly calculated by Irving's witnesses. Thus, to base an opinion on flawed statistics and inapplicable standards necessarily reduces the credibility of that expert testimony. Finally, as the Court noted at the time Irving's expert testified, Mr. France appeared to be more of an expert with regard to the manufacturing aspects of the debtors' business than the financial aspects of the debtors' business and the Court has weighted the testimony accordingly. Nonetheless, even Mr. France testified that the debtors' plan of reorganization, while an uphill battle, was possible although improbable. Clearly, the debtors' plan is substantially more than a "visionary scheme". *See In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr.D.N.J.1980) (court stated that the "purpose of Section 1129(a)(11) is to prevent confirmation of visionary schemes that promise creditors ... more under a proposed plan than the debtor could possibly attain after confirmation"). The court can clearly find from the evidence that the plan offers a "reasonable prospect of success." *In re Merrimack Valley Oil Co., Inc.*, 32 B.R. 485, 488 (Bankr.D.Mass.1983).

An additional element to be considered is the management of the debtor. As testified to by Jerry D. Davis, president of the debtors, management has remained unchanged since the bankruptcy proceedings in this matter were instituted. With the

exception of one mid-level management individual, all of the debtors' middle and upper-level management personnel has remained with the company. No evidence has been presented that the current management is dishonest or incapable and, therefore, this Court rules that the maintenance of the current management of the debtors adds credibility to the debtors' claim that reorganization will not be followed by liquidation as well as increasing the likelihood that further reorganization will not be required after confirmation.

Finally, the Court considers relevant at least two other factors in considering whether to confirm the debtors' plan of reorganization. First, the debtors have recently received approximately $830,000 in the form of a reversion from a discontinued pension plan. This cash, while currently being used to reduce interest expense, is available to the debtors and provides a fund by which the administrative expenses of the bankruptcy proceedings may be paid as well as serving as a sufficient buffer for any transitional cash requirements that the debtors may have in commencing operations under a confirmed plan. Cf., *In re National Awards Manufacturing, Inc.*, 35 B.R. 691 (Bankr.S.D.Ohio 1983) (where court denied confirmation largely because of concern over the debtor's poor cash and liquidity position; the debtor lacked sufficient cash to even pay administrative expenses of the Chapter 11 proceeding). Second, the debtors have a $2.8 million line of credit with BVA. This credit is available and nothing presented to this Court suggests that the line of credit will not be available in the foreseeable future.

For the reasons outlined above and a recognition that a court is never presented with a plan that is guaranteed to succeed, this Court finds that there is a reasonable prospect that the debtors' plan of reorganization will succeed and that liquidation or further reorganization of the debtors after confirmation is not likely. Having found that the debtors' plan is feasible, the final issue before the Court has been determined and § 1129(a)(11) has been satisfied. Therefore, the Court can and will confirm the debtors' plan of reorganization as sufficiently meeting all the requirements set out by § 1129(a) & (b) of the Bankruptcy Code.

The debtors are hereby ORDERED to prepare and present an appropriate order of confirmation in conformity with this opinion.