## In re BELCO VENDING, INC., William J. Bellissimo and Bellissimo Food Services Management Corp., Debtors.

Bankruptcy Nos. 83–1462–L, 83–1545–L and 84–0058–L.

United States Bankruptcy Court,
D. Massachusetts.

Oct. 9, 1986.

Daniel Cohn, Boston, Mass., for debtors.

## ORDER RE CONFIRMATION

HAROLD LAVIEN, Chief Judge.

Under consideration is the confirmation of three jointly administered Chapter 11 estates: Belco Vending, Inc., filed on October 24, 1983, William J. Bellissimo, filed on November 8, 1983, and Bellissimo Food Service Management Corp. (BFSM), filed on January 13, 1984. Belco is an operating company in the food service business. BFSM is a shell corporation that, at various times, has served as a sales arm to Belco. Under the Plan of Reorganization submitted by the debtor, BFSM and Belco will be merged post-confirmation. Bellissimo owns all the stock of Belco, and managed both corporations prior to the commencement of these Chapter 11 proceedings. On February 10, 1984, an order was issued by the Court directing joint administration of these three Chapter 11's, but not substantive consolidation.

There appears to be a tremendous overlap in the obligations of the three debtors. However, it becomes apparent on closer scrutiny that substantially all of the unsecured creditors are business related with the exception of a bank mortgage and taxes due on the debtor's home. As a result of the two debtor corporations' financial difficulties, the Small Business Administration (SBA) and the Winchester Savings Bank have received a personal guaranty from Bellissimo, supported by liens on the Bellissimo home. The home is also encumbered by a first mortgage in the amount of

$95,000 to Workingmen's Cooperative Bank for a loan granted to Mr. Bellissimo.

The debtors filed their first plan and disclosure statement on February 13, 1986, with the disclosure statement amended as of February 21, 1986. A hearing was duly held, at which time the disclosure statement was approved with an agreement that an amended plan of reorganization would be submitted, a hearing on confirmation was set for June 30, 1986. A second amended plan and disclosure statement were submitted prior to the date set for the confirmation hearing. No hearing was held, however, the debtors and Creditors' Committee having joined in a motion seeking a later date for a hearing on confirmation. A confirmation hearing was held on August 20, 1986 at which time the Court took the matter under advisement. After further review of the debtors' plan and disclosure statement, the Court set a hearing for September 22, at which time debtors' counsel was requested to specifically address the plan's feasibility pursuant to

11 U.S.C. § 1129(a)(11). At that time, debtors' counsel presented the Court, in lieu of any evidence, a pleading entitled, "Stipulation of Facts Concerning Feasibility of Reorganization Plan." The Court will, therefore, be limited to the representations made in the Second Amended Disclosure Statement and Plan, and the recently submitted Stipulation in addressing the present feasibility of confirming debtors' estate.

■ The debtors propose the following treatment of their creditors, and it should be noted that none of the parties in interest have objected; in fact, all of the classes have accepted the plan. As the debtors point out in the Stipulation, two types of payments to creditors are allowed for under the plan, immediate payments and future payments. The immediate payments required under the plan amount to some $184,000 divided as follows: a payment of $60,000 to the SBA, a 10% payment to the unsecured creditors amounting to $22,000 [1], a payment of $21,000 to the United States

1. Under the plan, unsecured creditors will also be issued non-voting preferred stock. The stock will equal ten percent of the creditors' claim and entitle the holder to receive two types of dividends, as stated in Debtors' Plan of Reorganization at 8, *In re Belco*, (83–1462, 83–1545, 84–0058) (Bankr.Mass.1986):

Minimum Dividends (calculated as a percentage of the face amount of the stock) shall be paid in accordance with the following schedule:

| Date Payable | Amount |
| --- | --- |
| November 1, 1986 | 2% |
| May 1, 1987 | 3% |
| November 1, 1987 | 4% |
| May 1, 1988 | 5% |
| November 1, 1988 | 6% |
| May 1, 1989 | 7% |
| November 1, 1989 | 8% |
| May 1, 1990 | 9% |
| November 1, 1990 | 10% |

and ten percent (10%) on the first day of May, 1991 and of each sixth month thereafter. Minimum Dividends shall be cumulative, *provided, however,* that if Belco should allow more than one Minimum Dividend to accumulate at any given time without having been paid, then the holders of Belco Preferred may vote, by a majority in number and two-thirds in amount, to exercise the right to elect all the directors of Belco and instruct them to liquidate the corporation. An Additional Dividend shall become due to each holder of Belco

Preferred on the 90th day after the end of each one-year period commencing on the first day of the month containing the second anniversary of the Effective Date and shall be in the amount of one-half percent (0.5%) of Belco's gross sales during such one-year period multiplied by a fraction, the numerator of which is the fact amount of such holder's Belco Preferred and the denominator of which is the total face amount of all Belco Preferred issued on the Effective Date (or later in accordance with Section 7.5 of the Plan). Additional Dividends shall be cumulative and shall not be required to be paid until redemption. Belco may, at any time, redeem shares of Belco Preferred by tendering (by deposit in the United States mail) to the holders thereof its check for three hundred percent (300%) (or, after the seventh anniversary of the Effective Date, one hundred percent (100%)) of the full face amount of the shares to be redeemed plus any and all Minimum Dividends and Additional Dividends theretofore due but not paid thereon. Belco will not pay any dividend on its common stock while any Belco Preferred is outstanding. Pursuant to the acquisition required under Section 7.2 of the Plan, all Belco Preferred will be cancelled and replaced by Class A Preferred Stock issued by the Reorganized Company on identical terms and conditions, and in identical amounts, to the Belco Preferred.

Trust Company in full settlement of its claim, $11,000 for various other claims, and approximately $70,000 in professional fees (part of which will be deferred). Apparently, the only reason the debtors are presently in possession of the monies needed to fund the plan is that the SBA has released $113,000 received from the proceeds of the debtors' real estate. The debtor corporations are only contributing $11,000 which seems to be the total amount they have been able to accumulate during their three years in bankruptcy.

The future payments required under the plan fall into two categories, date certain payments, and cash flow payments. The Date Certain Payments are comprised of: payments to the SBA, dividends to general unsecured creditors, and payments to the Internal Revenue Service and Massachusetts Department of Revenue over a five to six year period. The Cash Flow Payments are to be made to the SBA on interest due, on a quarterly arrangement, to be paid from 80% of the companies' "free cash flow" which, essentially means amounts not required for payments under the plan or operations of the debtors' business. Finally, after the debtors satisfy their debts to the Federal and State taxing authorities, which the debtors project to be completed six years after confirmation, the payments to the SBA will increase and as a consequence, be paid off seven years after confirmation. Thirty days thereafter, a lump sum payment of all interest due to the SBA will be made. In an additional thirty days, a payment of $38,000 will become owing to the Winchester Savings Bank. The debtor notes that should the corporate debtor fall short on either of these final two lump sum payments, "it is anticipated that Bellissimo will refinance his house and lend the company the amount necessary." Stipulation of Facts Concerning Feasibility of Reorganization Plan at 13, *In re Belco*, (83–1462, 83–1545, 84–0058) (Bankr.Mass.1986).

The bottom line is, that to a large extent, the plan of reorganization and payments to creditors is almost exclusively based on projections by the debtors of their future business operations. Clearly, the fea-

sibility of the debtors' projections regarding their business operations, is determinative as to the debtors' ability to meet the payment schedule set within the plan. The Court is barred from confirming a plan, even in cases in which payment to creditors is relatively independent of the future operations of the corporations, unless it determines, pursuant to 11 U.S.C. § 1129(a)(11), that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

As recently stated in *In re Agawam Creative Marketing Associates*, 63 B.R. 612, 619 (Bankr.Mass.1986):

> The purpose of Section 1129(a)(11) is manifold: 1) " 'to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan that the debtor can possibly attain after confirmation,' " *In re Pikes Peak Water Company*, 779 F.2d 1456, 1460 (10th Cir.1985), *quoting In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir.1985) and L. King, 5 *Collier on Bankruptcy* ¶ 1129.02 [11] (15th ed. 1984); 2) to prevent an abuse of the reorganization process by the confirmation of a plan of a debtor likely to return to bankruptcy, *In re Prudential Energy Co.*, 58 B.R. [857] at 862; and 3) to promote the willingness of those who deal with post-confirmation debtors to extend the credit that such companies frequently need. *Id.*

The Court of Appeals for the Eighth Circuit recently enunciated [sic] the Court's obligation in construing feasibility requirements: " '[i]n determing [sic] whether [a plan] is feasible, the bankruptcy court has an obligation to scutinize [sic] the plan carefully to determine whether it offers a reasonable prospect of success and is workable.' " *In re Monnier Brothers*, 755 F.2d 1336, 1341 (8th Cir.1985), *quoting United Proper-*

*ties, Inc. v. Emporium Department Store, Inc.,* 379 F.2d 55, 64 (8th Cir.1967). "Success need not be guaranteed." *In re Monnier Brothers,* 755 F.2d at 1341. However, when long term payments are contemplated stricter proof of feasibility is required. *In re White,* 36 B.R. 199, 204 (Bankr.D.Kan.1983); *In re RKO Associates,* 4 Bankr.Ct.Dec. 462 (Bankr.S.D. N.Y.1978).

The Court in scrutinizing the plan should consider "(1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; and (4) the ability of management." *In re Merrimack Valley Oil Co., Inc.,* 32 B.R. 485, 488 (Bankr.D.Mass.1983). Other factors include the prospective availability of credit and whether the debtor will have the ability to meet its requirements for capital expenditures. *In re Prudential Energy Co.,* 58 B.R. at 862–63. In light of these factors, [t]his Court cannot find that confirmation of the Debtor's plan "will not likely be followed by the liquidation or the need for further financial reorganization...." 11 U.S.C. § 1129(a)(11).

As this Court said in *In re Merrimack Valley Oil Co.,*

> [w]here a debtor proposes to fund a plan out of operating revenue, its financial record during the pendency of the Chapter 11 is probative of feasibility. Income projections indicating financial progress must be based on concrete evidence of financial progress, and must not be speculative, conjectural or unrealistic predictions. 32 B.R. at 488 (citations omitted).

At this point in time, the Court has grave misgivings as to the feasibility of the debtors' plan. Of foremost concern, is the belated and *uncertain* progress the debtors have made during the pendency of bankruptcy. Although the debtors have been in bankruptcy for nearly three years and managed by Bellissimo, II for at least half of that time, the operation has only managed to raise $11,000 and if administrative expenses were deducted, would have sustained a substantial loss. It is only in

the last three months that there has been an even potential turn-around in the business.

Prior to the recent upturn, the debtors included as part of the plan, submitted on June 27, 1986, projections of future financial operations. At the time of the plan's submission, the debtors' projection of future financial operations was unsupportable by its past or present performance. These projections included a nearly 80% increase in revenues the first year after confirmation, so that if this unsupported projection were off a mere 10 to 15 percent, the necessary payments could not be made. The only explanations offered by the debtors for this extraordinary progress being: (1) that the debtor will be "free from the operating constraints and competitive disadvantages of Chapter 11", Debtors' Disclosure Statement at 5, *In re Belco,* (Bankr.Mass.1986) (83–1462, 83–1545, 84–0058), (2) the debtor, William J. Bellissimo's son, Bellissimo, II, had joined the business. Bellissimo, II graduated from Yale in 1982 and spent some time working as an Assistant Treasurer for Chase Manhattan Bank. The Court finds the debtors' first assertion of the negative effects of bankruptcy contrary to its own experience. One of the basic intentions underlying Chapter 11, is to temporarily free a debtor from its overburdensome financial demands, in order to allow it to reorganize into a feasible business during the pendency of the bankruptcy. In enacting the Code, Congress did not view the potential negative connotations associated with a bankruptcy as interfering, to the point of preventing, a debtor from developing into a feasible business; otherwise, Congress would not have included the feasibility requirements of 11 U.S.C. § 1129(a)(11). As far as Bellissimo, II joining the business, this change occurred approximately two years ago. It is only within the last three months and, in fact, after the Court questioned feasibility, that Bellissimo, II has presented the potential of six new business opportunities to bolster the projections made by the debtors.

In the recently submitted Stipulation, the debtors revised the projections earlier included in the plan and increased anticipated earnings first year out of bankruptcy, from the 80 percent previously indicated, to 90 percent. Interestingly, both the earlier and more recently submitted projections call for the large, but necessary increase, and raise a question as to whether the mathematics was the child of the need. Under the old projections, even a 70 percent increase will be insufficient to meet the corporation's financial demands. While, under the new projections included in the Stipulation, as much as an 85 percent increase will be insufficient to meet the corporations' financial demands. A mere five percent margin of error would cause a shortfall under the plan.

Of the four arrangements which could truly be considered customers, all started within the last three months, the oldest dating back to July, another beginning September 15, the most recent starting on October 1, the fourth does not indicate a starting date. The other two arrangements are more accurately described as additional businesses run by the debtors, one of which the debtors started on September 15th, the kick-off date for the other is not indicated in the Stipulation.

Although the Court is impressed with the debtors' recent increased activities, at this time, the actual results of these new associations are too new to decide whether they will allow the debtors to meet extremely optimistic projections. As already noted, the debtors' performance prior to the filing and in the nearly three years of Chapter 11, lend little credence to the hoped for almost doubling of business. Even with this 90 percent projected increase, there is so little margin for error allowed under the projections, a drop of as little as five percent will result in the failure of the plan. There is no real test for the Court to apply in judging the feasibility of this plan, other than actual performance. With this in mind, the Court must note that even though the debtors have been in bankruptcy three years, they would be unable to fund the plan without the help of the SBA. Of the $184,000 necessary to fund the plan, the SBA has contributed $113,000 from the sale proceeds of some of the debtors' property. The debtors are only able to contribute $11,000 [2].

After three years in bankruptcy, it may be that the debtors have recently made some progress in reorganizing into a viable business. The Court is hesitant to deny confirmation of the debtors' plan of reorganization, even though the debtors' progress has been too slow in coming and has developed too close to the confirmation hearing to determine its long-term effect. Furthermore, while success by all objective criterion seems doubtful, every creditor, secured and unsecured, has expressed confidence in the debtors and their new business potential. With this in mind, the Court has decided to postpone a decision on confirmation of the corporate debtors for six months to test their projections and to better determine whether hope can in fact give birth to reality.

■ As for the individual case, I have a different problem. The individual debtor seeks to continue to live in a rather luxurious style, uninterrupted by his bankruptcy. Under the plan, he will continue to own and live in a home worth anywhere from $500,000 to $750,000. Of course, there are mortgages and taxes which he will be obligated to pay under the plan. It is unclear how much equity will exist in the house during the six or seven years projected under the plan. Presumably, enough equity will accumulate during this period so that the debtor feels comfortable in providing in the Stipulation that if the corporate debtors are unable to meet the balloon payments, Bel-

---

2. There is a discrepancy between the Plan and Stipulation as to the amount of money necessary to fund the plan. According to the plan, $124,000 is necessary; under the Stipulation, approximately $184,000 is the amount needed.

The Court assumes that the $60,000 increase in available funds was received from the sale of some antique rugs, formerly used in Bellissimo's home.

lissimo may be willing at that time to remortgage his home.

Oddly enough, the senior Bellissimo will continue to draw a salary of $35,000 a year even though it is unclear that he will be playing an active role in the reorganized debtors. It should be noted, that the salary to Bellissimo is a recent change, provided for in the Stipulation, after the Court questioned feasibility. Prior to this, there was no indication from what source, if any, Bellissimo would obtain the funds necessary to meet his personal obligations. Rather, Bellissimo, II was the only person mentioned who would draw a salary. The new arrangement, introduced in the Stipulation, has Bellissimo, II drawing no current salary and a salary starting in the second year after confirmation. The Court is rather surprised by the recent mention of a salary for Bellissimo since, to the best of its knowledge, he has never attended the court hearings and is not presently involved in the corporation. Rather, the full responsibility for running the corporation seems to be resting on Bellissimo, II. It should also be noted that the Court has never received a statement of the financial obligations of the individual debtor and a projection of his living expenses over the life of the plan. In fact, why the individual is in Chapter 11 is not clear except, of course, to protect his not very modest residence from any secondary liability.

Where there is no objecting creditor, secured or unsecured, (apparently, the unsecured get at least 10 percent in cash and fear their debts would, in litigation, be found to be corporate debts with zero value in liquidation), what should be the Court's role, if any, when the plan may turn out to be feasible but the individual presents a public perception of having beaten the system? Why, when discharge is a matter of privilege, not right, *U.S. v. Kras*, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973), should the debtor be allowed the luxury of the creature comforts of continued mansion life style while creditors are not paid in full and the fragile public acceptance of the fairness of the bankruptcy law takes another beating? Fresh start is a cornerstone of enlightened bankruptcy, but did Congress intend to allow the bankrupt to emerge looking like the 'en grand seigneur'?

This symbol of affluence is not a necessary ingredient of the plan. In fact, if it were sold, much of the indebtedness could be reduced or paid off with the potential of even a surplus to provide the individual debtor reasonable habitation. Of course, this solution might well deprive the unsecured creditors of their 10 percent gift if in fact they were not determined to be creditors of the individual. On the other hand, if by practical marshalling the corporate debts were paid off or substantially reduced by the sale of the William J. Bellissimo estate, the unsecured creditors' position in the corporate debtors might even exceed the lost 10 percent.

Probably all legal systems depend to a great extent on symbolism and a willingness to abide by the spirit of the law. This has to be even more so in a democracy where, unlike a police state, self enforcement is an important ingredient. A loss of respect for law, as illustrated by the Vietnam years, points to the importance of the public perception of basic fairness. Furthermore, under the common law approach, not everything can be, or is even expected to be, spelled out in minute detail and Congressional intent and what is known as the spirit of the law fills in the blanks.

> We subscribe to the 'familiar rule' expressed by the Supreme Court in another context, that 'a thing may be within the letter of the statute and yet not within the statute, because it is not within the spirit, nor within the intention of its makers.'

*United Steelworks of America v. Weber*, 1979, 443 U.S. 193, 201, 99 S.Ct. 2721, 2726, 61 L.Ed.2d 480; *Aliberti v. E.F. Hutton & Co., Inc.*, 591 F.Supp. 632 (Garrity, D.J., D.Mass.1984).

Bankruptcy Judge Ryan in *In re Mensch*, 7 B.R. 804 (Bankr.S.D.N.Y.1980) very succinctly described the role of the court, when faced with a result clearly frustrating the spirit of the law as Congress in-

tended, had it visualized the events in question.

A court must not limit itself to the one word in a section which stands out, but must 'look to the provisions of the whole law, and to its object and policy.' *Philbrook v. Glodgett*, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975). This is especially so where language accepted and applied literally leads to absurdity or the abrogation of congressional intent. *United States v. Bryan*, 339 U.S. 323, 338, 70 S.Ct. 724, 734, 94 L.Ed. 884 (1950); *Church of the Holy Trinity v. United States*, 143 U.S. 457, 4590460, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892).

"... Judge Learned Hand wrote over thirty years ago, in a case which disregarded the explicit language of a statute in favor of the clearly expressed legislative intent:

'It does not therefore seem to me an undue liberty to give the section as a whole the meaning it must have had, in spite of the clause with which it begins. Such treatment of a statute needs no apology today, whatever were the scruples of the past. There is no surer way to misread any document than to read it literally; in every interpretation we must pass between Scylla and Charybdis; and I certainly do not wish to add to the barrels of ink that have been spent in logging the route. As nearly as we can, we must put ourselves in the place of those who uttered the words and try to divine how they would have dealt with the unforseen situation; and, although their words are by far the most decisive evidence of what they would have done, they are by no means final.'

"*Guiseppi v. Walling*, 144 F.2d 608, 624 (2d Cir.1944) (concurring opinion), *aff'd sub nom. Gemsco, Inc. v. Walling*, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945)."

*Marriott In-Flight Services v. Local 504, Air Transport Division, Transport Workers of America*, 557 F.2d 295, 299 (2d Cir.1977).

To grant a discharge to this individual debtor by way of the proposed joint plan and confirmation would make a farce of the system. Congress could never have intended to extend the privilege of a Chapter 11 discharge to one whose sole objective is apparently the retention of his right to live in a veritable manor house, while, in reality, no reorganization of that individual's financial affairs has taken place during bankruptcy. If Bellissimo has no real creditors, why is he seeking the umbrella of Chapter 11? To simply protect a luxurious residence is not the purpose of bankruptcy, in general or Chapter 11, in particular. The doctrine of a fresh start is abused when it becomes a device for preserving a favored luxury position. The Chapter 11 plan as it relates to the individual debtor, is denied confirmation.