**In re Rodney D. HENDRICK (S.S. # 438–50–6808), Debtor.**

**Bankruptcy No. 83–00787.**

United States Bankruptcy Court, M.D. Louisiana.

Jan. 10, 1985.

See also, Bkrtcy., 45 B.R. 965.

William E. Steffes, Baton Rouge, La., for debtor.

David S. Rubin, Baton Rouge, La., for trustee.

John C. Anderson, Baton Rouge, La., for mover.

Lawrence R. Anderson, Jr., Baton Rouge, La., for one of creditors.

RESTATED REASONS FOR CONFIRMA-
TION OF DEBTOR/TRUSTEE PLAN
OF REORGANIZATION AND FOR
REJECTION OF POLK PLAN

WESLEY W. STEEN, Bankruptcy Judge.

## I. Facts [1]

The facts of this case are unusually important. The issues involved are personal and highly emotional. The trial climate has also been significant. Each motion and issue has been vigorously contested, even ordinarily routine ones. Of course, the issue of plan confirmation has been especially heated.

The Debtor (hereinafter "Rodney") and Judith Elaine Polk (hereinafter "Judy") were married in April, 1965. In 1971 Rodney went to work for his father-in-law, Herbert Polk, at Polk Chevrolet, Inc., a Chevrolet dealership in Baton Rouge, Louisiana. In 1973 Rodney became general manager of the dealership.

Judy is the only child of Herbert Polk. Mr. Polk is an aggressive successful businessman; Mr. Polk is largely responsible for the success of the automobile dealership in which Rodney was employed.

In October, 1981, Rodney and Judy separated in fact; on April 2, 1982, a petition for legal separation was filed. Rodney continued to work at his father-in-law's business for a short time after the separation, but under apparently very strained circumstances. About October, 1982, Judy began to work at the business, and Rodney resigned. On April 15, 1983, a divorce was granted based on mutual fault.

On November 21, 1983, Rodney filed this Chapter 11 case. On January 31, 1984, Don Starns was appointed trustee in the case with the consent of all parties, including the Debtor. It was hoped that the appointment of a trustee would reduce the emotional level of the case.

Substantially all of Rodney's property was acquired during the time that he was married to Judy, residing in Louisiana, and living under the community property regime established by Louisiana law. During the existence of the marriage, Rodney's economic and financial affairs (i.e., the community property financial affairs) were very closely linked to Herbert Polk, Rodney's father-in-law. This financial interrelationship stands out prominently in the bankruptcy schedules:

A. Virtually all of the substantial assets listed by the Debtor are minority interests in closely held corporations (and one partnership) in which Herbert Polk is a major investor (directly or indirectly): [2]

| Company | Rodney & Judy's % |
| --- | --- |
| Car Kits | 50% |
| Polk Chevrolet, Inc. | 25% |
| Polk Investments | 15% |
| PFC, Inc. | 10% |
| Stinger Boats | 2% |

B. The only substantial debts listed in the schedule are also apparently closely linked to Herbert Polk.[3]

| | Creditor | Amount |
| --- | --- | --- |
| 1. | Lamar Central Florida (a Herbert Polk controlled partnership) | $178,375.[4] |
| 2. | Polk Chevrolet | 123,314.[5] |
| 3. | Sanders, Downing (a legal fee due in connection with |

1. The confirmation hearing in this case contains the facts necessary for adequate appellate review in case of appeal, but this statement of the facts of the case is drawn not only from the facts presented at the confirmation hearing, but also from a personal review by the Bankruptcy Judge of the entire case record (consisting of three volumes), briefs of counsel (both pre-hearing and post-hearing), and agreements and representations of counsel at the numerous conferences and hearings in the case. The failure to repeat all prior testimony and representations at the confirmation hearing is not the fault of counsel, who did a superb job of representing their clients (albeit hyperenthusiastically at times); time limits externally imposed are at fault. Because of the limitations of time and for the efficient administration of the case, the Court must take notice of the record and other contested issues in this case as background of the case.

2. The only other really substantial assets are the family home and furnishings. The home has been sold in these proceedings.

3. This excludes debt to Louisiana National Bank paid upon sale of the family home.

4. This debt was originally approximately $300,-000. It appears that Judy paid one-half of the debt in an attempt to avoid being named as a defendant in the suit on this note.

5. This amount has been reduced to $7,500 by offset of a bonus due from Polk Chevrolet.

| Creditor | Amount |
|---|---|
| an investment jointly made with Herbert Polk) | $30,000. |
| 4. Al Collins (a disputed, unliquidated debt allegedly arising on account of joint tortious conduct of Rodney Hendrick and Herbert Polk) | 4,000,000. |
| 5. Other debts apparently unrelated to Herbert Polk (approximately) | 75,000–100,000. |
| 6. Endorsement of PFC, Inc., debt | Contingent, but $600,000 maximum. |

Rodney and the trustee, in their joint disclosure statement, assert that this bankruptcy case resulted from an economic squeeze play that caught Rodney between his ex-wife and her father.[6] The allegation is that Judy obtained an injunction that prohibited Rodney from alienating any community property, while Judy's father caused[7] Lamar of Central Florida to file suit against Rodney for the $300,000 that he owed. Rodney testified at the confirmation hearing that this was the reason for filing the bankruptcy proceeding.[8]

While the Polk interests do not specifically so allege, implicit in their memoranda of authorities is the assertion that the motive for filing of the bankruptcy petition was to "forum shop" to obtain a more beneficial community property partition than Rodney could obtain in state court as a result of La.R.S. 9:2801, which allegedly prefers a partition of assets in kind over a partition by licitation.

Whatever the actual motivating force for the filing of this case, it has been hotly and emotionally contested. On the issue of confirmation alone the Court has received 26 pleadings consisting of plans, amended plans, disclosure statements, amendments to disclosure statements, supplements to amendments to disclosure statements, objections to plans, memoranda in support of plans, memoranda supporting objections to plans, *etc.*

## II. The Plans

Two plans were filed: one by Polk Chevrolet, Inc., and Judith Elaine Polk (the "Polk" plan); one jointly by the Debtor (Rodney Hendrick) and the trustee (the "Debtor/Trustee" plan).

The Polk plan can be summarized as follows:

A. Sell (or offset/liquidate against debts) the house, notes receivable, Polk Chevrolet bonus, and stock in Baton Rouge Country Club, Stinger Boats, Inc., Car Kits, Inc.;

**6.** The Debtor/Trustee disclosure statement makes this allegation in great detail. The Polk interests filed a competing plan and disclosure statement; it *adopted* the Debtor/Trustee statement of the "Background of the Debtor" and thus apparently concedes this allegation. It should be noted that the Polk disclosure statement limits its adoption of the Debtor/Trustee disclosure statement to be "... without admitting judicially any adverse statements ..." This Court is simply unwilling to accept such a broad disclaimer. The Polk attorneys know quite well how to except statements in the Debtor/Trustee disclosure statement; the Polk attorneys proved this ability because they *did specifically* make three exceptions to the Debtor/Trustee disclosure statement. If the Polk interests did not agree with these facts, they had a duty to set forth their own version in their disclosure statement, but chose not to do so. The Polk interests challenged the Debtor/Trustee "economic squeeze play" assertion by testimony of Herbert Polk at the confirmation hearing.

**7.** Herbert Polk testified at the confirmation hearing that he owns 48% of Lamar of Central Florida and votes another 8% owned by Polk Chevrolet. (Transcript, p. 113). The debt has subsequently been reduced to $178,375 as discussed above, footnote 4, and in footnote 8 below.

**8.** Transcript, pages 17–20. The joint Debtor/Trustee disclosure statement, unchallenged on this issue, states that the Lamar suit on the community obligation was filed only against Rodney, and it asserts that the state court twice sustained exceptions of nonjoinder of an indispensable party (*i.e.* Judy). The Polk interests assert that the reason that Judy was not sued the second time was that in the interim between the first and second suits, Judy paid half of the loan with money borrowed from her father. The Debtor/Trustee rejoin with the assertion that this reason was rejected by state court since Judy remained liable on the note and that the pleadings were finally amended to add Judy as a defendant, but with instructions to the sheriff that Judy not be served.

B. Sell or abandon to Rodney Hendrick: Chevy Suburban (subject to mortgage—no equity), 200 Honda ATC, 1974 boat, 8 dogs, some household goods, some wearing apparel, Rodney's personal effects;

C. Pay one-half of community debts from funds raised above; Judy to agree to pay the other one-half of the community debts within six months.

D. Partition the following assets in kind between Rodney and Judy (the plan calls for the Court to divide these equitably, but does not explain how):

1. Polk Chevrolet stock;
2. PFC, Inc.;
3. Some household furnishings.

The Polk plan divides creditors into nine classes; classes 1–4 are not significant to the present decision because they involve administrative, priority, and secured creditors, some of whom have already been paid. The remainder of the classes are:

Class 5: Rodney's separate debts plus Rodney's and Judy's claims against the community;

Class 6: Community claims to be satisfied by Judy;

Class 7: Secondary liability claims against the Debtor;

Class 8: Debtor's equity claims;

Class 9: Judy's equity claims.

The Debtor/Trustee plan is simpler. It would liquidate all assets, pay all debts, and divide the remainder, if any, between Rodney and Judy. The plan, after multiple amendments, appears to track 11 U.S.C. § 726, with particular reference to § 726(c).

## III. Louisiana Law

This case is concerned almost exclusively with community assets and debts: Civil Code Articles 2340,[9] 2360, 2361. Overgeneralizing one can say that property acquired during the existence of the community property regime is community property; debts arising for the common benefit during the existence of the regime are community debts. Property that is acquired and debts that arise before or after the community regime are separate property and debts.[10]

Civil Code Article 2356 provides that a community property regime terminates by a judgment of separation from bed and board. After the termination of the community regime, a spouse's obligations (both separate and community obligations) that were incurred before or during the community regime may be satisfied from the property of the former community and from the separate property of the spouse who incurred the obligation, CC Art. 2357. The same rule applies during the existence of the community regime, CC Art. 2345. After termination of the community, a spouse becomes liable for *all* obligations (including separate obligations of the other spouse for which there would otherwise be no personal liability) "... up to the value of that community property ..." disposed of if he or she disposes of property of the former community for purposes other than satisfaction of a community obligation. But, a spouse who disposes of community property can avoid *full* liability for debts incurred by the other spouse; this is done by executing a written act under which the spouse assumes responsibility for one-half of each

**9.** There is some question as to alleged gifts made to one of the spouses during the marriage. These assets are of insignificant value for purposes of determining plan confirmation. The question of the classification and exempt status of those assets is reserved to an opinion to be issued later on that subject.

**10.** The Polk attorneys assert that the Collins claim should be considered a separate claim. The argument is that the obligation arises *ex delicto* and therefore is a separate obligation, not a community obligation. That is not the law. A claim that arises during the existence of

the community is separate or community, depending on whether it arises for the common benefit of the spouses (Art. 2360) or not (Art. 2363). The evidence before the Court is that the Collins petition alleges that Rodney wrongfully acted to increase the value of the PFC stock, a community asset. No evidence has been presented to show that Rodney's alleged actions were for himself exclusively. Unless shown to the contrary, a debt that arises during the community is presumed to be a community debt, CC Art. 2361. Therefore, it appears that the Collins claim is a community debt.

community obligation incurred by the other spouse. There are rights of reimbursement between the spouses when one spouse benefits at the expense of property of the other, CC Art. 2364–2368. A procedure is established for partition of the community, La.R.S. 9:2801.

The legislation apparently functions tolerably well for solvent community property regimes. In such cases, the parties simply divide the assets and liabilities by consent or a court partitions the assets and liabilities in kind or sells the assets and (presumably) orders the payment of the debts. In case of partition by licitation, serious questions arise concerning liability of the former spouses.[11] In case of partition in kind, the property of the former community in the hands of either of the ex-spouses would be susceptible of seizure to satisfy creditors.[12] In summary, Louisiana law contemplates that spouses can amicably partition their property during the existence of the community[13] or after termination of the community.[14] If they are unable to partition amicably, La.R.S. 9:2801 provides a procedure for judicial partition after termination of the community. In any case, pre-dissolution creditors are protected since they may seize property of the community (or property of the former community if the community has terminated) or the separate property of the spouse who incurred the obligation.

This constitutes the extent of the Louisiana legislation. There is no guidance for insolvent or for potentially insolvent community property regimes. There is no di-

rection for a court concerning whether and how to pay debts. There is no method for equitable allocation of assets among creditors, particularly unsecured creditors.[15] There is no efficient system established for dealing with contingent or disputed claims such as the Collins claim in this case.

It is standard practice in Louisiana upon separation or divorce for one spouse to enjoin the other from alienating community assets pending a partition of the community property. Such an injunction could prove a powerful weapon in the hands of a spouse who did not personally incur a community obligation; this results because a creditor may satisfy such an obligation out of the property of the former community *or* out of the separate property of the spouse who incurred the obligation. Under such circumstances, the post-dissolution earnings and other separate property of the enjoined spouse are in jeopardy while that spouse is denied access to the community property that is the property primarily intended to satisfy the community obligation. Even if the standard injunction is not used vindictively, there is no authority or guidance to deal with the disastrous financial effects of default on obligations resulting from inability to meet community obligations with community assets. There is no automatic stay to prevent wasteful foreclosures and forced sales.

The legislative history of the matrimonial regimes law indicates legislative inability to come to grips with the problem. Two potential solutions were rejected by the legis-

11. A number of commentators have questioned the result when the assets cannot feasibly be partitioned in kind with assumption of the liabilities. Some of the commentators have suggested unanticipated, dire consequences that could result from the sale of property of the former community, even if the sale were a judicially ordered sale by licitation. *See* Riley, "Analysis of the 1980 Revision of the Matrimonial Regimes Law of Louisiana", 26 *Loy.L.Rev.* 453 (1980); Spaht and Samuel, "Equal Management Revisited", 40 *La.L.Rev.* 83 (1979); Note (Orlansky) "Termination of the Community", 42 *La.L.Rev.* 789 (1982).

12. CC Art. 2357. *See* Riley, *supra, and see* Spaht and Samuel, *supra* at page 125.

13. CC Art. 2336.

14. CC Art. 2336 (see especially comment (a)).

15. For examples of the kinds of difficulties that can arise, see Spaht and Samuel, *supra*, 40 *La.L. Rev.* 83,140. The lack of legislative consideration and solution is reflected in this comment: "Obviously not enough legislative attention was focused upon the interplay of the two articles regulating the rights of creditors at termination and the general provisions on judicial partition." 40 *La.L.Rev.* 83,141.

lature, but no substitute was adopted. The jurisprudence prior to 1980 established a fictitious continuation of the community property regime for the purpose of liquidating and paying debts; the undivided ownership of the spouses was limited to an interest in the equity of the community after payment of debts. This concept was apparently rejected in the 1979 statute.[16] A second way to deal with the problem would have been to create a state judicial mechanism for administration of the community and for payment of its debts. The 1978 legislation contained such a statutory procedure for judicial administration; that procedure was repealed before it became law.[17]

The lacuna of authority or guidance from the Louisiana legislature is not just theoretical; it is particularly real in this case. The legislature has provided a set of substantive principles that can lead to unexpected, illogical, and financially dire consequences because no procedure is established to implement the policy goal.

## IV. Interrelation of Louisiana Community Property Law and Federal Bankruptcy Law

Louisiana law obviously is the authority that determines the property rights of the former community property regime and also determines its debts. If neither spouse files a bankruptcy petition, Louisiana law also determines how that property will be divided and how the liabilities will be shared.

The Polk interests argue that Louisiana law is persuasive authority concerning the decision of which plan to confirm when one of the ex-spouses files a bankruptcy petition prior to the partition of the community. That argument is not correct, at least in the case at bar in which it is possible that the estate will be insolvent. This estate will have assets of approximately $3,000,000,[18] but approximately $2,000,000 of this amount is the valuation of closely held business interests, so valuation is speculative at best. If the Collins claim is sustained, the estate will have debts of approximately $5,534,248.99, including the $4,000,000 Collins claim.

The Polk interests argue that the Collins claim should be estimated as having no value. In some circumstances, and for some purposes, the Court might be willing to do so: but not in this case for purposes of plan confirmation. The reason is simple; the Polk interests ask the Court to balance equities so that Judy Polk will not be required to bid to purchase her own property (e.g. her one-half interest in community property). But if the Collins claim is eventually determined to be substantial, under the Polk plan insufficient assets will remain to pay creditors. Will Judy receive her partitioned assets subject to liability under CC Art. 2357 to pay all community debts? Will the plan constitute a written agreement pursuant to CC Art. 2357 to pay one-half of all community debts?[19] The Polk plan could easily raise more litigation than it puts to rest. The Court will not confirm a nonliquidation plan that has one leg of its foundation anchored in the absolute assumption that the largest ($4,000,000) unsecured claim is worthless.

---

16. For further discussion of this issue, see Spaht and Samuel, 40 *La.L.Rev.* 83,139. *But see Succession of Dunham*, 428 So.2d 876 (La.App., 1st Cir., 1983) and LeVan, 9 Louisiana Estate Planner 304 (1984) concerning continued administration of the entire community in the context of a succession proceeding.

17. La.R.S. 9:2851 repealed by 1979 Acts No. 709.

18. Computed as follows:

| | |
|---|---|
| House (at actual sale value) | $ 590,000 |
| Miscellaneous | 212,340 |
| Corporate investments | 2,097,727 |
| Total | $2,900,067 |

19. The Court notes that Judy has not executed, nor has she offered to execute, a written agreement pursuant to Art. 2357. The Polk plan is apparently not an agreement pursuant to Art. 2357 since under that plan, Judy agrees to pay one-half of Class 6 claims. There is also vague reference to her agreeing to pay "community claims." Exhibit E to the plan lists the Collins claim both as a "separate" claim and as meritless. The Court is unsure whether the plan, as such, could be enforced against Judy if the Collins claim is found to have merit and to be a community claim.

■ The Polk interests argue that the Court should enforce (what they perceive to be) a preference in Louisiana law for partition in kind over liquidation of the estate; failure to do so, they assert, will encourage forum shopping. The Court is not here deciding all cases for all factual possibilities. This decision is limited to holding that Louisiana law and partition priorities (if any) do not apply in a bankruptcy case involving Louisiana community property when there is a reasonable possibility of insolvency. This decision also holds that these priorities (even if they are correctly perceived by the Polk interests) do not apply, and the Court will not abstain when the Debtor is encountering economic difficulties because of the simultaneous existence of (i) suits against him personally for money judgments on community debts, (ii) an injunction against him prohibiting alienation of community assets, (iii) a prolonged inability to effect an amicable or court-ordered partition of the community property regime, and (iv) an incomplete state law scheme for administration of the former community, liquidation of assets, and equitable allocation of assets among creditors and equity interests. A property division under such circumstances is obviously a situation of economic distress; that is the stuff of which bankruptcy law is made. In other cases, under other circumstances, the Louisiana statutes might be found persuasive.[20] The Bankruptcy Code comprehensive scheme for disposition of the property of the former community and for payment of its debts must be given effect under the supremacy clause.

A second question involving the interrelationship of state and federal law is the definition of property of the estate. Section 541(a)(2) provides that community property is "property of the estate." This section is not limited to the debtor's interest in community property, but includes a non-debtor spouse's interest in community property as well.

"The estate also includes the interests of the debtor and the debtor's spouse in community property ..." House Report No. 95–595, 95th Cong., 1st Sess. 367–8 (1977); Senate Report No. 95–989, 95th Cong., 2d Sess. 82–3 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5869, 6324.

"Thus in those states where spouses equally or jointly manage and control all their community property, a petition by one spouse alone passes all the community property to the estate pursuant to section 541(a)(2)(A). This result does not represent a change from the former Bankruptcy Act. The only property of either spouse which would not be included in the estate is the separate property of the nondebtor spouse." 15 *Collier on Bankruptcy*, ¶ 541.15.

The comprehensive treatment of community property in the Bankruptcy Code is continued in § 726(c) which prescribes the distribution of community property to creditors. A very elaborate system of allocation is established in case the estate includes both community property and separate property. The Court has no doubt but that the entire community property, even the half of the spouse who did not file a bankruptcy petition, would be property of the estate if Rodney and Judy had not separated prior to Rodney's filing.

■ A difficult question arises in this case, however, since the community property regime terminated prior to filing. As discussed above, Louisiana courts have held under prior law that the community regime fictitiously continued for the purpose of liquidating assets and paying debts, but the 1979 Act apparently rejects that approach. The question, then, is whether this termination of the community property regime vested Judy with an undivided one-half interest in property that did not become property of the estate. The Court can find no dispositive authority, but the Court holds that the termination of a community property regime, absent a partition,

---

**20.** It also remains to be decided whether the Polk interests correctly interpret Louisiana law to establish a priority partition and the strength of that priority in a case with these facts.

does not change the result; the entire property of the former community becomes property of the estate. The Court finds six reasons supporting this conclusion.

First, it should be noted that none of the parties has raised the point, despite their filing both pre-confirmation and post-confirmation briefs. Both former spouses and all their creditors have, for almost a year in these proceedings, treated the "property of the former community" as "community property." Thus, it would seem that the meaning of "community property" in general legal parlance includes the property of the former community. Second, La.CC Art. 2357 does not refer to a spouse's separate property interest in property that was once community property; it refers to "property of the former community." This would lead one to believe that the spouse's rights in "property of the former community" is somehow different from separate property undivided one-half interests. Third, a creditor's right to property of the former community is the same as his rights to community property prior to termination of the community.[21] Since the creditor's rights are virtually the same, it would seem that "property of the former community" for purposes of bankruptcy law § 541(a)(2)(B) is community property as defined therein. Fourth, the reference to "community obligations" is also suggestive; the statute does not speak of an "obligation of the former community", but speaks of "community obligations." If subsequent to the termination of the community, an *obligation* remains a "community obligation," then surely an asset remains a "community asset," albeit that the joint management and other aspects of the community property regime have ceased to apply. Fifth, the Bankruptcy Code does not define "community property," but does define "community claim" [22] as a claim that can be satisfied out of community property included in the estate under § 541(a)(2). Since Civil Code Article 2357 allows community obligations to be satisfied out of "property of the former community", and since § 541(a)(2)(B) includes in the estate community property that is "liable for an allowable claim against the debtor", then "community property" for purposes of § 541(a)(2) would include "property of the former community." Sixth and finally, any other interpretation would upset the scheme of § 726(c) for distribution of property according to a rational, ordered, nationally uniform set of priorities that includes intricate calculations to take into account separate assets and debts.

For all of these reasons, "community property" for purposes of § 541(a)(2) must include "property of the former community" existing between Rodney and Judy, notwithstanding the fact that the community regime may have been terminated prior to the filing of the bankruptcy petition. Whether or not the property is "community property" for other purposes, especially various state law determinations, is not determinative, but Louisiana law would probably reach the same result for these limited purposes.[23]

Under the facts of this case, then, the Court looks exclusively to 11 U.S.C. §§ 101–1174 to determine plan confirmation. It need not, and will not abstain.

## V.  Confirmation Under Title 11 U.S.C.

The requirements for plan confirmation are found in 11 U.S.C. § 1129.

### A.  The Polk Plan

■  All parties agree that the Polk plan meets the requirements of § 1129(a)(1), (2),

---

**21.** There is actually one difference after termination: post-dissolution debts cannot be satisfied out of property of the former community, but pre-dissolution creditors have the same rights as they did prior to dissolution.

**22.** 11 U.S.C. § 101(16).

**23.** A theoretical basis can be constructed for these results. The community property *regime* terminates as provided in CC Art. 2356; thus, the additions to community property would cease, joint management would end, *etc.* However, community property is a patrimonial mass distinct from the spouses' separate property and would retain its identity even after termination of the regime that gave rise to its distinct identity. That seems to be the scheme of CC Arts. 2358–2369. More important, it appears to be the scheme of 11 U.S.C. §§ 541(a)(2) and 726.

(9), and (10); all agree that § 1129(a)(5) and (6) are not applicable. The issues, therefore, are whether the Polk plan meets § 1129(a)(3), (4), (7), (8), and (11); the Court finds that none of these requirements is met.

Section 1129(a)(3) requires that the plan be proposed in good faith and not by any means forbidden by law.[24] The Debtor and Trustee contend that the plan was not offered in good faith but in a spirit of spite, vindictiveness, and without regard to the proponent's interests as a creditor: as evidence, the Debtor and Trustee suggest:

1. That one of the proponents (Polk Chevrolet) is a creditor with a $7,500 claim; yet that proponent (according to his own attorneys) has spent and continues to spend many times that amount in legal fees related to this plan; [25]

2. That there has been bitter, extended litigation and financial maneuvering by the parties allegedly leading to this bankruptcy case involving, among other things, the alleged economic pincer movement discussed above; the Debtor and Trustee suggest that the Polk plan is merely a continuation of that enmity.

The Court is not prepared to make a finding that the Polk plan has been proposed in bad faith. But neither is the Court prepared to make a finding that the plan is proposed in good faith. The proponents of the Polk plan have offered only terse, conclusory testimony of Judy Polk and Herbert Polk concerning their "good faith" and thus have not met their burden to show that the plan was proposed in good faith.

Section 1129(a)(4) requires, in pertinent part, that:

"Any payment made or to be made by the proponent ... for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable;"

The Court is frankly sympathetic to the comment in Mr. Anderson's memorandum that the compensation of the attorneys for the Polk interests is nobody's business but theirs and their clients; since the payment does not deplete the estate, the Court finds little need for the disclosure. But the statutory requirement is explicit. Polk Chevrolet and Judith Elaine Polk are plan proponents; the payments made by them in connection with the case *and* in connection with the plan have not been approved by, and are not subject to, approval by the Court. Therefore, the plan does not comply with § 1129(a)(4).

Section 1129(a)(8) requires that the plan be accepted by each class of creditors that is impaired. "Accepted" means that the creditors vote in favor of the plan by a margin of more than two-thirds in amount and one-half in number. The Polk plan has classes of creditors whose interests are impaired and who have not accepted the plan. Therefore, it does not meet the requirements of § 1129(a)(8).

However, § 1129(b) provides that a plan may be confirmed, notwithstanding failure to meet § 1129(a)(8), if with respect to each impaired class that has not accepted the plan: (i) the plan does not discriminate unfairly, and (ii) the plan is fair and equitable. Section 1129(b)(2)(B)(ii) provides that a plan is not fair and equitable if a junior claimant might receive any property before senior claimants are paid in full.

In this case, Judy (in her status as co-owner) is a junior claimant to all other creditors. Since it is possible under the plan for Judy to receive some property

24. The only issue is whether the plan is proposed in good faith; no one has suggested that it has been proposed by a means forbidden by law.

25. Judy's testimony at the confirmation hearing was that Polk Chevrolet was paying all lawyers who were advocating the Polk interests: hers and the company's. This lends some credence to the Debtor/Trustee assertion that Polk Chevrolet's interests are not simply economic or financial. Transcript, page 36.

while some creditors are not paid in full, this would violate the absolute priority rule and, consequently, the requirements of § 1129(b)(2)(B)(ii) are not met.

Section 1129(a)(11) requires that the plan be sufficiently probable of successful implementation that it is not likely to be followed by liquidation or by the need for further reorganization. In the Polk plan, Judy would agree to pay one-half of the community debts; those debts are somewhere between $290,875 and $4,915,875.

Pages 61–66 of the confirmation hearing transcript give a picture of Judy's financial status. She has monthly income of $1,400 per month, take home. She has a trust fund that she does not know much about; she receives no income from it. This is the only information in the record concerning her income. The information on her living expenses and debts is sketchy at best. Her utilities run $250–$400 per month, and her telephone bill runs $50–$100 per month. She recently purchased her home from the bankruptcy estate. She paid approximately $600,000, of which she will have to pay at least one-half since the estate owned one-half.

Judy has made no arrangements to acquire funds to meet her obligations under the plan: page 64 of the transcript:

Q. "... How do you intend to make those payments?"

A. "Float a loan, I guess."

Q. "Float a loan, where?"

A. "The Bank. A personal loan."

Then on page 65:

Q. "Do you have any commitment from any person whatsoever to make you a loan?"

A. "A commitment?"

Q. "Yes."

A. "I haven't asked for a commitment."

Q. "You have no commitment?"

A. "I haven't asked anyone to borrow money."

Mr. Herbert Polk testified at the confirmation hearing that Judy would have enough money to fund her obligations under the plan. Transcript pages 98–100. His testimony, however, is that Judy "... only owes sixty-two thousand dollars under the plan." Obviously he does not believe that she would have to pay the Collins claim in any event. In addition, even Mr. Polk's testimony provides no specifics concerning the source of Judy's funds to meet her plan obligations. The following testimony was in response to his own counsel on direct examination:

Q. "Other than the arguable Al Collins claim, do you believe she has on hand sufficient money or agreements with creditors to fully satisfy her obligations under the plan?"

A. "Well, I don't know that she has all of the money to complete the plan, but I know that the funds can become available." Transcript, page 99.

The substance of the Polk plan is that Judy's father would furnish the money to pay Judy's obligations under the plan; there is a statement to this effect in the Polk disclosure statement, page 5:

"Judy Polk Hendrick has no substantial assets other than those in the Estate which are available to fund her obligation. Her main financial source is intended to be her father, Herb Polk, who has indicated his willingness to assist his daughter. However, he is under no legal obligation to do so."

Life is fragile; the future is uncertain. Herbert Polk is a man of advanced years. If he were to pass away or to suffer a disabling disease or injury, despite his laudable motives he might be unable to fulfill his current intentions. With no legal obligation to fund the Plan, creditors would have no protection. In addition, there has been no showing that Mr. Polk has the financial resources to fund his daughter's obligation under the plan *even if* he were to obligate himself to do so.[26]

---

26. Mr. Polk's reputation certainly would lead one to believe that he has the financial ability to fund Judy's obligations, particularly if the Collins claim is without merit. But cases must be decided on evidence, not unsubstantiated reputation. The Polk plan proponents have offered

For these reasons, the Court cannot find that the Polk plan meets the requirements of § 1129(a)(11).

## B. The Debtor/Trustee Plan

■ The memoranda of authorities have not argued that the Debtor/Trustee plan fails to meet the requirements of § 1129(a)(2), (3), (4), (5), (6), (9), (10), or (11);[27] the issues, then, are whether the plan meets the requirements of subsections (1), (7), and (8).

Subsection (7) can be dealt with relatively quickly. The Polk interests argue that § 1129(a)(7) is a "best interests of creditors" test and, consequently, the Debtor/Trustee plan cannot be confirmed since they perceive that Judy's interests would be served best by partition rather than by the liquidation proposed by the Debtor/Trustee. This Polk argument fails for two reasons.

First, even if § 1129(a)(7) were a "best interests" test, the test would not be a "maximum conceivable" benefit test, but would be a "best choice among reasonably workable alternatives" test. The parties have had since April 2, 1982, to partition their property; they have had the opportunity to do so amicably as well as judicially under La.R.S. 9:2801. The parties have been unable to effect such a partition. The Polk interests have had since November, 1983, to file a partition plan in this bankruptcy proceeding and have failed to propose a plan that meets statutory requirements for confirmation. The Court must conclude that partition is not a reasonably workable alternative and hence should not be considered in determining what is in the best interests of creditors.

Second, while "best interests of creditors" may be a useful shorthand for practitioners, it is not statutory language. The statute simply requires that impaired classes who do not accept the plan must receive under the plan at least as much as they would receive under a Chapter 7 liquidation. The Debtor/Trustee plan is a liquidating plan designed to follow Chapter 7, and consequently, the requirements of § 1129(a)(7) are met.

The dispute is similarly resolved with respect to the requirement of § 1129(a)(8) through its alternative § 1129(b). Since the Debtor/Trustee plan is a liquidating plan adopting Chapter 7 requirements, and since partition is not a viable alternative, the requirements of § 1129(b) (and thus 1129(a)(8)) are met.

■ The most substantial question regarding the Debtor/Trustee plan is that it does not meet the requirements of § 1129(a)(1) which is a requirement that the plan meet all of the requirements of Title 11 U.S.C. The Polk interests argue that the plan does not meet the requirements of § 363(h). That section sets forth four requirements that must be met before the trustee can sell property free and clear of the interest of a co-owner. The Polk interests assert that each of those requirements has not been met with respect to Judy's one-half community property interest in assets; the argument is without basis because § 363(h) does not apply to property of the estate; it applies to property jointly owned by the bankruptcy estate and by a third party. As discussed in IV above, "property of the former community" is "community property" and is "property of the estate" under § 541; therefore, the trustee may sell the entire community property interest pursuant to § 363(b). Sections 363(f) and (h) only apply to sales of property of an entity *other than* the estate. Since the estate owns the interest of both the debtor *and* the non-debtor spouse, there *is no* other entity to be con-

no evidence of Mr. Polk's financial strength; indeed, the attorneys for the Polk plan have vigorously resisted any discovery related to such financial data, even when that discovery was related to property interests that Mr. Polk holds jointly with the Debtor. Even if Mr. Polk has the financial strength to fund Judy's obligations, however, he has undertaken no legal obligation to do so and apparently is unwilling to do so. See Transcript, page 127.

27. The Debtor/Trustee plan is a simple liquidation. Therefore, most of these requirements are not cogent.

**988**

cerned with § 363(h). Therefore, that subsection simply does not apply with respect to the non-debtor spouse.

The failure of § 363(h) to apply its four requirements to a non-debtor spouse's interest in community property is no legislative oversight. In § 363(i), Congress allowed a "first right of refusal" to co-owners when property is sold under § 363(h), and *also allowed* such a first right of refusal to the non-debtor spouse with respect to community property that is property of the estate. If Congress had intended for the four requirements of § 363(h) to apply to community property, it could have included "the spouse's interest in community property" in § 363(h) as it did in § 363(i).

For the reasons stated above, the Debtor/Trustee plan appears to meet the requirements of § 1129 and will be confirmed. However, there are several objections by the attorneys for the Polk interests that are outside § 1129.

First, the Polk interests argue that "readjustment" is favored by the Bankruptcy Code over liquidation. Assuming for argument that this is so, "readjustment" is at most a preference and not a requirement. The parties have had almost three years to "readjust" and have been unable to do so. The Polk interests have had more than a year to file a "readjustment" plan that can be confirmed; they have been unable to do so. When one cannot achieve what one prefers, one must instead do what one can: in this case, liquidate.

Second, the Polk interests argue that liquidation will result in adverse tax consequences to Judy. While taxes are regretable, in view of the inability to effect another alternative, the additional taxes, if any, are necessary.

The objections regarding state law policy and "forum shopping" have already been considered. The Polk objections concerning inadvisability of rejection of executory contracts and liquidation of exempt property have been cured by plan amendment.

## VI. Conclusion

In conclusion, the Court finds that the Polk plan does not meet statutory requirements for confirmation and that the Debtor/Trustee plan does. An order will be entered accordingly.