**In the Matter of SOUND RADIO, INC., t/a WNJR Radio 1430, a corporation of New Jersey, Debtor.**

**Bankruptcy No. 84–06261.**

United States Bankruptcy Court, D. New Jersey.

Dec. 9, 1988.

agreed pursuant to HIC's request for final payment on the electrical subcontract.

Walter Greenhalgh, Kleinberg, Moroney, Masterson & Schachter, for debtor in possession.

Marc Friedman, Kalb, Friedman & Siegelbaum, for proponent, Daniel Robinson.

Jonathan Rabinowitz, Ravin, Sarasohn, Cook, Baumgarten, Fisch & Baime, for proponent, Sarco Communications, Inc. & Danny Stiles.

Richard Meth, Kirsten, Simon, Friedman, Allen, Cherin & Linken, for Rollins Communications, Inc.

Michael Lehman, Lehman, Wasserman & Jurista, for Official Unsecured Creditors Committee.

Harry Heher, Jr., Heher, Clark & St. Landau, for Shareholder Class other than Daniel Robinson.

Kathryn Ferguson, Markowitz & Zindler, for LeBow Communications, Inc.

## OPINION

WILLIAM H. GINDIN, Bankruptcy Judge.

This matter comes before the court on the application of various parties in interest seeking confirmation of their respective plans of reorganization of the debtor company. All of the plans propose to pay

stockholders 100 percent plus interest. The debtor has presented no plan for confirmation.[1]

## PROCEDURAL HISTORY

During the course of the proceedings, it became clear that there are major disputes among the various shareholders of the debtor corporation. On October 30, 1985, the court denied a motion to dismiss the Chapter 11 proceedings, determined that it would abstain from exercising jurisdiction over the shareholders' dispute, and authorized the filing of competing plans.

Three plans remain before the court. The plan of reorganization proposed by LeBow Communications, Inc. ("LeBow plan") proposes that all creditors be paid in full, that general unsecured creditors be paid in cash plus 10 percent interest compounded quarterly and that stockholders be bought out. The plan proposes $4,000,000.00 as the base amount to be used for compensation to the stockholders for the buyout. The LeBow plan is an outgrowth of an earlier plan proposed by Stephen LeBow (LeBow) in conjunction with an entity known as Sheridan. On October 22, 1987, Sheridan withdrew its participation in the original Sheridan/Lebow plan and the attorneys sought to be relieved from the case.[2] Steven LeBow appeared personally as principal of LeBow Communications on November 19, 1987. During colloquy with the court, it became clear that in the absence of Sheridan, LeBow was unable to fund any plan. Although the commencement of confirmation hearings had already been set, the court stated from the bench that it would permit LeBow to file a disclosure statement and plan within 10 days of the November 19th date.

On December 7, 1987, LeBow filed his disclosure statement and plan, and on December 14, 1987 the court ordered a hearing on the disclosure statement for December 21, 1987. The order directed service of same on short notice. Objections to the disclosure statement were filed by the debtor on December 17, 1987. Among other defects, the disclosure statement failed to indicate the manner and source of funding. On December 21, 1987, the court directed the filing of an amended disclosure statement. None was filed and on February 10, 1988 the attorneys for Daniel Robinson brought a motion to preclude LeBow from introducing evidence regarding confirmation of its plan alleging the failure to file the amended disclosure statement and to answer interrogatories directed, among other things, at the source of financing of the LeBow plan. Compliance not having been shown as of the commencement of the confirmation hearings and hearings on related matters, on February 23, 1988 the court granted the motion precluding the introduction of evidence. On February 24, 1988, the court entered an order precluding the filing of an amended disclosure statement and plan. No testimony, therefore, was taken concerning the LeBow plan.

The plan of reorganization of Daniel Robinson ("Robinson") (hereinafter referred to as the "Robinson plan") was initially filed on February 11, 1986. Subsequently amended, it is one of the two plans remaining for consideration. This plan likewise calls for payment of 100 percent of allowed claims of unsecured creditors together with interest. Stockholders are to be bought out by a fund of $3,250,000.00. Robinson would take credit for his own equity interest in the corporation and, as a result, would not be required to put up as much cash as an outsider would. Robinson also indicated that in the event the Superior Court determines that he owns a lesser interest than he thinks he does, he would be prepared to pay the amount above that originally estimated.

The final plan was presented by Danny Stiles ("Stiles") and Sarco Communications, Inc. (hereinafter referred to as the "Sarco plan"). This plan, as well, will pay all

---

1. On May 7, 1985, the debtor filed a plan of reorganization. On June 25, 1985, the debtor modified the plan. Confirmation was never granted, and no evidence was presented in support of confirmation.

2. See certification of Paul R. DeFilippo, Esq. filed November 6, 1987.

classes of creditors in full. A 100 percent payment is allowed to unsecured claims and a 10 percent interest factor is to be paid to such claimants. Sarco's plan was first filed on February 13, 1985 and has since been amended. The plan currently calls for a total expenditure of $4,100,000.00 without credit for any stock ownership.

Note should be made that while the debtor did not submit a plan, it filed a brief in opposition to the Sarco plan. Furthermore, all of the shareholders except Robinson, jointly filed a brief opposing the Robinson plan and supporting the Sarco plan.

## FACTS

Testimony taken at the hearings established that Sound Radio, Inc., the debtor, is an AM radio station broadcasting under the call letters WNJR, Radio Station 1430. Minority owned and operated, the debtor directs its contemporary format programming to a largely black and urban audience. The focal point of its listenership is Newark, New Jersey and the metropolitan New York area. Seventy percent of its advertising revenue comes from local merchants. The facilities of the station are located at 600 North Union Avenue, Hillside, New Jersey. While Robinson is the lessor of some of the equipment necessary for the operation, the lease itself is non-cancellable and will survive any determination of this court. The real estate occupied by the debtor is owned by Hillside Realty Associates, an unrelated business entity which has leased the property to Seico, Inc., a New Jersey corporation owned and controlled by proponent Robinson. The premises have been sublet to the debtor corporation, and the lease runs until June 30, 1995.

It is clear that all creditor claims total approximately $1,676,000.00. This is based on estimates for administration in the approximate amount of $325,000.00, federal and state tax and employment tax claims totalling $94,300.00, other priority claims approximately $7,000.00, one secured claim of $200,000.00 and unsecured claims of $800,000.00 with anticipated interest costs of $250,000.00.

With respect to the equity holders, it would appear that the Robinson plan would yield $385.00 per share and the Sarco plan, $589.00 per share. These amounts are subject to adjustment and must be subjected to the test of feasibility.

It is necessary, therefore, to review the testimony in light of the elements of 11 U.S.C. § 1129 in order to make factual findings necessary to a determination.

## CONFIRMATION REQUIREMENTS OF A PLAN UNDER 11 U.S.C. § 1129

■ The Bankruptcy court has a mandatory duty to determine whether a plan of reorganization has met all the requirements of 11 U.S.C. § 1129 for confirmation.

Initially, § 1129(a)(1) requires that the plan itself comply with the provisions of the Bankruptcy Code. A most cursory examination of the two plans indicates beyond any question that both the Robinson and the Sarco plans comply with the provisions of the Bankruptcy Code, and no further inquiry as to that element is necessary.

§ 1129(a)(2) requires that the proponent of the plan have complied with the applicable provisions of the Bankruptcy Code. No evidence was presented suggesting that the proponents of the Sarco plan have not complied with the provisions of the Code. They are, in fact, outsiders who have simply presented a plan. While one of the principals of the proponent Sarco, Stiles, had a prior connection with the debtor corporation and was involved in litigation with the debtor, the matters in dispute were resolved prior to the confirmation hearing and no issues remain open.

■ With respect to the Robinson plan, the brief filed by the shareholders asserts certain actions by Robinson which would seemingly violate the applicable provisions of the Code. It is necessary for this court to recognize that there is pending litigation between Robinson and the other shareholders (except for LeBow) and the issue of corporate control is presently pending before the Superior Court of New Jersey. If

it is true that Robinson filed the Chapter 11 petition without the knowledge, authorization or approval of the Board of Directors, it may be disquieting, but the relationship of Robinson to the other shareholders is to be determined by the state court. These allegations, if proved, constitute violations of New Jersey corporate law. The Bankruptcy Code requirement is much more limited and only insists upon compliance "with the applicable provisions of this title" § 1129(a)(2). *In re Texaco, Inc.*, 84 B.R. 893 (Bankr.S.D.N.Y.1988); *See In the Matter of Robert J. Cothran*, 45 B.R. 836, 838–839, (D.C.S.D.Ga.1984); *In re Stapleton*, 55 B.R. 716, 722 (D.C.1985). *But cf. In re Mahoney*, 80 B.R. 197, 200–201, (Bankr.S.D.Cal.1987). The position of Robinson with respect to the lease of real estate referred to above is, at first blush, subject to criticism. The court notes, however, that with respect to the real estate, Robinson made full disclosure at all times.

The other stockholders allege inappropriate self dealing, with resulting damage to the signal and, consequently, the ratings of the debtor radio station. It would appear, however, that these matters also are properly within the purview of the abstention order and that conclusions cannot and should not be based upon matters pending adjudication in the state court where the bankruptcy court has determined that it should not act. Thus, this court cannot and should not conclude that there has been a violation of § 1129(a)(2).

In deciding whether a plan should be confirmed under 11 U.S.C. § 1129(a)(3), the court must decide that the proposed plan is in "good faith and not by any means forbidden by law." *In re Koelbl*, 751 F.2d 137, 139 (2nd Cir.1984). The "good faith" test requires that the proposed plan "bear some relationship to the statutory objective of resuscitating a financially troubled corporation." *Kane v. Johns–Manville Corp.*, 843 F.2d 636, 649 (2nd Cir.1988). In this context, the good faith test means that the plan was proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code. *In re Cherry*, 84 B.R. 134, 137. (Bankr.N.D.Ill.1988) quoting from *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr.S.D.Cal.1982). Such a determination should be made in view of "the totality of the circumstances surrounding confection" of the plan. *In re Future Energy*, 83 B.R. 470, 486 (Bankr.S.D.Ohio, 1988) quoting from *In re Jasik*, 727 F.2d 1379, 1383 (5th Cir.1984).

The bankruptcy court is in the best position to assess the good faith of the parties' proposals. To find a lack of "good faith" courts have examined whether the debtor intended to abuse the judicial process and the purposes of the reorganization provisions. A finding of a lack of good faith is especially appropriate when no realistic possibility of an effective reorganization exists and it is evident that the debtor seeks to delay or frustrate the legitimate efforts of secured creditors to enforce their rights. *In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir.1985). Prior behavior of the debtor before the filing of the petition is not the test of "good faith". The only test of "good faith" is whether the reorganization plan can succeed. *In re Texas Extrusion Corp.*, 68 B.R. 712, 723 (D.C.N.D.Texas 1986).

In the case before this court, the "good faith" requirement raises a different type of problem. As seen above, the "good faith" test is not very structured and requires relatively little specificity. It deals, however, with the plan itself and not with the actions of the proponent. Those actions are analyzed in connection with § 1129(a)(2). It is alleged, and testimony taken from Robinson's own mouth sustains the position that Robinson acted high-handedly and arbitrarily in filing the initial petition. At the time of the petition, he was not a majority shareholder nor even apparently an officer, but only held the office of Chairman of the Board. He violated corporate resolutions and failed to obtain ratification of his determination to file the Chapter 11 petition. Self-dealing with respect to Seico, Robinson's own corporation, presented serious questions as well, and during the early stages of the instant proceeding there were financial transactions

which were not approved by the court. Sarco alleges, as well, that Robinson signed and filed a plan and disclosure statement on behalf of the debtor which was not only inappropriate, but done with knowledge that the plan, as submitted, did not comply with the law. That issue is moot, however, since the plan was never confirmed.

■ The instant plan, however achieved, will pay out 100 percent of all claims and it is the instant plan that the court must judge for good faith. The plain meaning of § 1129(a)(3) has nothing to do with prior plans, but rather with the plan which is presently before the court. In *In the Matter of Madison Hotel Associates*, the court held that a plan which proposes to pay all creditors in full was, on its face, submitted in good faith. *In the Matter of Madison Hotel Associates*, 749 F.2d 410 (7th Cir. 1984). While Robinson may be subject to criticism in the state court action or even in an appropriate action in this court, nothing done rises to the level of disqualification due to a lack of good faith.

There has been no suggestion made to this court that the Sarco plan is not in good faith.

Both plans meet the requirements of 11 U.S.C. § 1129(a)(4). Clearly, under the provisions of that section, payments to be made for administration expense are, and will be subject to court approval and both plans submit to the jurisdiction of the Bankruptcy court for these purposes.

11 U.S.C. § 1129(a)(5) requires disclosure of the future controlling personnel. In the case of Sarco, the officers and directors will be Rafael Diaz (Diaz) and Stiles. Hugh McComas (McComas) is an investor and will not hold any position as director, officer or voting trustee. This is a new ownership and the management team and Sarco, as a corporation, will own 100 percent of the stock of the reorganized debtor corporation. With respect to the position of Robinson as a proponent, the result is equally clear. Robinson anticipates buying all of the stock in the corporation and operating the station himself. 11 U.S.C. § 1129(a)(5) does not require anything more than full and complete disclosure and this court must find that both proponents have made such full and complete disclosure.

11 U.S.C. § 1129(a)(6) is inapplicable, as there is no regulatory jurisdiction over the rates to be charged by Sound Radio.

With respect to the provisions of 11 U.S.C. § 1129(a)(7), the issue with which the court must concern itself is the value of the business. The section deals with the appropriate treatment of impaired classes, and pursuant to both plans, the only possible impaired class is the class of equity interests in the corporation. Thus, the liquidation value of the debtor becomes important only with respect to a determination of the reasonableness of the offer. Not surprisingly, the difference is not as great as the testimony would appear to suggest initially. The testimony of Anthony Rizzo, a radio business broker, established a fair market value of $3,000,000.00 to $3,200,000.00. He did not give a liquidation value. Harvey Roberts, presented as well by Robinson, found a liquidation value of $3,250,000.00. Sarco presented an evaluation by Charles Kadlec wherein he gave a fair market value of $5,500,000.00 and then applied a liquidation factor of between 80 percent—90 percent to the fair market value. He suggested a liquidation value between $4,860,000.00 and, when certain other factors concerning quick assets were taken into account, $5,470,000.00.

■ It is clear from the testimony of all three experts that the liquidation value is almost impossible to ascertain. While admittedly there is some $580,000.00 in cash and accounts receivable, the physical assets of the debtor have minimal worth, while the broadcasting license is the important asset. The only finding that need be made under an 11 U.S.C. § 1129(a)(7) analysis is that the various interests will get as least as much under the plan as they would in a liquidation. This court must therefore conclude that under either the Robinson plan or the Sarco plan, creditors would receive as much as they would in liquidation, since they each would get 100 percent of their claim plus interest. The equity interest holders would likewise get as much as they

would in liquidation since the testimony stated that in a "worst case scenario" the Rizzo value corrected for a forced sale discount (and there is no testimony that such is an appropriate approach to liquidation value), suggests a liquidation value of $2,400,000.00. Both plans propose to pay in excess of that amount of money. Hence, no further inquiry is necessary. The real value or market value is determined by the bids, but it must be noted that § 1129(a)(7) does not address market value.

■ 11 U.S.C. § 1129(a)(8) requires acceptance by the class of impaired interests, since acceptance under 11 U.S.C. § 1126 requires two-thirds in amount and one-half in number. The unusual situation in the within case is one in which the Superior Court has yet to determine ownership. Such failure hinders the possibility of acceptance. § 1129(b)(1) allows the court to approve a plan, provided it does not "discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan". This "cram down" allows the court to make a determination as to what is fair and equitable and what constitutes a non-discriminatory approach. Neither of the plans discriminates unfairly, since all creditors are to be paid in full and all shareholders are to receive the same amount per share.

The question of whether or not the plan is fair and equitable has been answered by the United States Supreme Court which has decided that the "absolute priority rule" must be enforced. *Norwest Bank Worthington v. Ahlers,* 485 U.S. ——, ——, 108 S.Ct. 963, 966, 99 L.Ed.2d 169, 176 (1988). Clearly both plans comply. The effective date of the plan is the date upon which priority expenses and claims shall be paid in full. Both plans define the effective date and propose to make the appropriate payments at that time. The definition of effective date in the Sarco plan includes the requirement of approval of the Federal Communications Commission, (F.C.C.), while the Robinson plan asserts that it does not need anything more than a *pro forma* approval of the F.C.C.

and will therefore be ready to proceed more rapidly than the Sarco proponents. While the issue raises itself under (a)(10), it is essentially a feasibility issue and will be discussed as part of feasibility.

The focal point of any inquiry into the confirmability of a plan presented pursuant to Chapter 11 of the Bankruptcy Code, must be 11 U.S.C. § 1129(a)(11) which provides:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Under this section, the Code requires the court to "prevent confirmation of visionary schemes which promise creditors more under a proposed plan that which the debtor can possibly attain after confirmation". *In re Trail's End Lodge,* 54 B.R. 898, 903–904 (Bankr.D.Vt.1985) quoting from *In re Matter of Pizza of Hawaii, Inc.,* 761 F.2d 1374, 1382 (9th Cir.1985).

The feasibility test is firmly rooted in predictions based on objective fact and looks at the probability of actual performance of the provisions of the proposed plan. "Sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are any visionary promises." *In re Clarkson,* 767 F.2d 417, 420 (8th Cir.1985) quoting *In re Bergman,* 585 F.2d 1171, 1179 (2d Cir.1978). In effect, the court is required to predict, based on the historical data provided by the parties, whether the debtor will "be able to make all the payments under the plan and to comply with the plan." (11 U.S.C. § 1225(a)(6)) *In re Snider Farms,* 83 B.R. 1003, 1006 (Bankr. N.D.Ind.1988). All that is required is that there be a reasonable assurance of commercial viability. *In re Great Northwest Recreation Center, Inc.,* 74 B.R. 846, 852 (Bankr.D.Mont.1987) quoting from *In re Trail's End Lodge,* 54 B.R. 898, 904 (Bankr.D.Vt.1985). Indeed, the Supreme Court in *United Savings Assoc. v. Timbers of Inwood Forest Assoc., Ltd.* has stated in a pre-confirmation context that there must

be "a reasonable possibility of a successful reorganization within a reasonable time." *United Savings Assoc. v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. ——, ——, 108 S.Ct. 626, 632, 98 L.Ed.2d 740, 751 (1988) quoting from the *en banc* opinion of *In re Timbers of Inwood Forest Associates, Ltd.* 808 F.2d 363, 370 (5th Cir.1987). Certainly, this language encompasses a reasonable prospect of a successful post-confirmation operation.

The court must also prevent an abuse of the reorganization process by denying confirmation to a plan where the debtor likely to return to bankruptcy. *In re Belco Vending, Inc.*, 67 B.R. 234, 236 (Bankr.D. Mass.1986). However, guaranteed success is not required nor is it the standard. Although most debtors emerge from reorganization with a handicap, "... [g]uaranteed success in the stiff winds of commerce ..." is not the standard. *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr.S.D.N.Y. 1986).

■ · Under § 1129(a)(11), all that is required is a "reasonable" prospect for financial stability and success. *In re Prudential Energy, Co.*, at 862. The Code also requires the court to determine whether § 1129(a) requirements have been met even if no objections have been asserted and requires the debtor to provide sufficient documentation and to answer appropriate questions. *In re Snider Farms, Inc.*, at 1013. Other requirements the court should consider when considering plans of reorganization are: (a) the adequacy of the capital structure; (b) the earning power of the business; (c) economic conditions; (d) the ability of management; (e) the probability of the continuation of the same management; (f) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *In re Future Energy Corp.* at 503. All income projections indicating financial progress must be based on concrete evidence of financial

progress, and must not be speculative, conjectural or unrealistic. *In re Merrimack Valley Oil Co., Inc*, 32 B.R. 485, 489 (Bankr.D.Mass.1983).

Last, the prospective availability of credit and whether the debtor will have the ability to meet its capital expenditures should also be examined as well as any related factors which would materially reflect on the company's ability to operate successfully and implement its plan. *In re Prudential Energy Co.*, 863. *In re Snider Farms, Inc.* at 1012.

## FINDINGS

■ While certain weaknesses have been pointed out, this court finds that both plans pass the statutory tests of good faith and feasibility.

The areas of dispute between Sarco and Robinson center around the ability of the proponents to fund the plans, the ability to provide working capital, the ability to achieve F.C.C. licensing and the ability to manage the reorganized debtor. The Sarco plan provides for a purchase price of $4,100,000.00. It has available to it $2,000,000.00 from the Howard Savings Bank, a $1,250,000.00 investment by McComas by the lending of funds received from Banco Popular of Puerto Rico and a personal investment of $875,000.00. The Howard Savings loan is without conditions and is apparently available when needed. The Banco Popular loan has been the subject of much discussion that this court draws the inference from all of the testimony that that loan is available and remains available.[3] While the commitment contains a finite termination date, the willingness of Banco Popular to extend that termination date during the course of the proceedings permits the court to draw the inference that such extension will continue. With respect to the Diaz financing, Diaz does have funds presently on deposit in New York and they are available.

**3.** The proponents of the Sarco plan have sought to supplement the record by showing further correspondence from Banco Popular extending the dates. The first supplement was allowed while future attempts have been denied. The court feels such supplements are unnecessary in view of this finding.

The Robinson plan is a little bit more tenuous. In order to fund his plan, he needs $2,300,000.00 since he claims that he will get credit for the shares of the stock he already owns. He has $1,600,000.00 available from Midlantic Bank and $500,000.00 available from Equico Capital Corporation. Equico will also make an additional $150,000.00 available if necessary and Robinson asserts that he has $250,000.00 available from his own personal funds.

It should be noted that the "minority" stockholders of Sound Radio assert in the Superior Court, Chancery Division action, that Robinson does not own any Sound Radio stock. Other assertions suggest the possibility that Robinson only owns 42 percent of the stock instead of the 58.5 percent of the stock which he claims. Obviously, such a result would require a reexamination of the Robinson funding position. Again, it is inappropriate for this court to draw any inferences concerning the possible outcome of the state court litigation.

The only conclusion which can be drawn from the evidence presented is that the Sarco plan appears to be appropriately funded while the Robinson plan is dependent upon the outcome of the state court action. Both plans include some working capital.

The next question concerns the ability of either of the proponents to successfully operate the debtor corporation. Sarco, in the person of Diaz, clearly has the appropriate expertise and ability to operate the station. His background in the radio business qualifies him and his assertions of experience were unchallenged. He proposes to use Stiles, with whom the present management of the station has difficulty working, but who clearly demonstrates a long term commitment to the station. Stiles is also knowledgeable with respect to both the audience he proposes to serve and the market he proposes to work in to obtain revenues. Robinson, while high-handed in his operation of the station, has also demonstrated his ability to operate it. When the disputes are resolved and all of the funds are available, it appears that he knows what is needed. It is clear from the testimony that the market is broadening and that the debtor may anticipate a reasonable growth. This court finds that either of the proponents is fully capable of presiding over that growth.

Much was made of the necessary approvals of the Federal Communications Commission (F.C.C.). Testimony on behalf of Robinson clearly sets forth the fact that the only application required by Robinson is essentially an information filing and the F.C.C. expert, John Bankson, anticipated very rapid approval for Robinson. Mr. Bankson also testified that he knew of one case where objections to a change in ownership such as that required by Sarco took sixteen months to finalize. Sarco has included in its plan a limit on its contingency of 90 days. An honest evaluation of Bankson's testimony, however, when coupled with the testimony of Jerome Silber, makes it clear that about the only thing that could delay such approval within the time period set forth in the plan would be some inappropriate action by Robinson. Bankson admitted as much when questioned about his honest expectations. Surely, this court cannot assume nor would it suggest that if Robinson were to be unsuccessful, he would take inappropriate action before the F.C.C. The only inference that can be drawn from the testimony is that Sarco could meet the 90 day approval deadline without difficulty.

With respect to the ability to have cash available for the effective date, the requirement would, as in most cases, present some difficulty. However, cash appears to be available to both Sarco and Robinson as part of their long term financing arrangements.

Thus, with respect to the issue of feasibility, it is clear that both Sarco and Robinson have presented appropriate testimony concerning feasibility. The only caveat arises with respect to the ability of Robinson to go forward if the Chancery Division determination results in a significant decrease in his claimed ownership. In such event, Robinson may not have the necessary funding available. Otherwise, both proponents can obtain the necessary short

term financing; both proponents are fully capable of operating the station; and both proponents will have no difficulty in satisfying the requirements of the F.C.C.

One other area of feasibility should be mentioned. The Sarco plan is able to go ahead immediately upon confirmation. The Robinson plan must await a determination of the ownership of the stock, since Robinson proposes to take credit for his own shares and the number of those shares has not yet been established as a matter of law. While all parties in good faith anticipated that the determination in the Chancery Division would have been made some time ago, the exigencies of litigation have prevented that result. Thus, Robinson's claim of possible delay in getting F.C.C. approval could well pale next to his own delay in getting a final decision from the Superior Court of New Jersey, Chancery Division.

Under 11 U.S.C. § 1129(a)(12), there is a requirement that the debtor have paid all fees prior to confirmation. It appears from the file that the debtor has made the appropriate payments and that no problem exists. Any adjustment which needs to be made at the effective date would be nominal in the context of the entire plan.

Under § 1129(c) if more than one plan is proposed, this court may only confirm one plan. In determining which of the proposed plans to confirm, this court is required to consider the expressed *preferences of creditors and equity security holders* as mandated by § 1129(c). *In re Rolling Green Country Club*, 26 B.R. 729, 735 (Bankr.D.Minn.1982). Appointments to or continuance in, an office of the debtor as director, officer or voting trustee must also be consistent with the interests of creditors and equity security holders and with public policy. (§ 1129(a)(7)(A)(ii)). This includes the making of an informed judgment as to whether the proposed reorganization plan is in the best interests of the creditors. *United Properties, Inc. v. Emporium Dept. Stores, Inc.*, 379 F.2d 55, 63–64 (5th Cir.1967). The "best interest of the creditors" test of § 1129(a)(7) is really a "best choice" test among reasonably workable alternatives. The Code requires that im-

paired classes who do not accept the plan must receive as much under the plan as they would receive under a Chapter 7. *In re Hendrick*, 45 B.R. 976, 987 (Bankr.M.D. La.1985).

On balance, the proposed Sarco plan is the stronger and the more likely to be successful. In the final analysis, the court must also look to § 1129(c) which requires it to "consider the preferences of creditors or equity security holders in determining which plan to confirm". If Robinson, in fact, owns 58.5 percent of the stock, then as an equity security holder, the court must give preference to him. On the other hand, the creditors, except for Robinson and LeBow, have clearly expressed their preference for the Sarco plan. In pre-code days, the law was similar and was expressed by Judge Whipple in *In the matter of Imperial '400' National, Inc.* Judge Whipple's language presents a guide for this court when he said:

> If more than one plan is found to be fair, equitable and feasible, I conceive it to be the duty of the reorganization court to submit all such plans to the creditors and stockholders for their consideration … [except] circumstances could arise, even in this case, whereby delay, confusion and the probability of no plan being approved might persuade a reorganization court to consider special procedures when more than one plan meets the statutory criteria.

*In the Matter of Imperial '400' National, Inc.*, 374 F.Supp. 949, 952 (D.C.N.J.1974).

Judge Thomas Britton, in discussing competing plans, simply asserted that the debtor's actions had been fraught with delay and the case had to go forward. He affirmed the plan of a creditor bank using "cram down" as a basis and made the requisite findings. *In re Holywell Corp.*, 54 B.R. 41, 42 (Bankr.S.D.Fla.1985), aff'd. 59 B.R. 340 (S.D.Fla.1986). While it is necessary to consider the various competing interests carefully, the court must take all of them into account and proceed with what is in the best interest of the creditors.

CONCLUSION

It is clear from all of the testimony that the Robinson plan, if confirmed, will foster delay, further litigation and dispute. Certainly, one can anticipate that whichever determination the Chancery Court ultimately makes (and it could be many months before any determination is made) such a determination could be the subject of appeal and further dispute.

On the other hand, if the approval of the Sarco plan and the finalization of such approval occurs in the expected sequence, the debtor corporation can go forward with its appropriate "fresh start" and ability to function as a competent, reorganized and successful company.

Finally, one cannot overlook the fact the Sarco plan proposes to pay more money per share to the equity security holders. As Judge Steen in *In re Hendrick, supra,* said:

> ... [E]ven if § 1129(a)(7) were a "best interest" test, the test would not be a "maximum conceivable" benefit test, but would be a "best choice among reasonably workable alternatives" test.

45 B.R. at 987. While the statement may be somewhat out of the context of the instant case, it is clear that when the court must choose between two plans, it must make the choice most beneficial to all creditors *and* equity interest holders.[4] On an economic basis, the equity interest holders will receive substantially more money under the Sarco plan.

Based on all of the foregoing, the Sarco plan is factually the more feasible plan. It is the "best choice" under all of the circumstances and will be confirmed. The Robinson plan is therefore rejected.

The attorney for Sarco shall submit an order accordingly.

---

**4.** While no court has established a "best choice" test for competing plans under § 1129, trial courts have used such an approach in other circumstances. See *Pan American World Airways, Inc. v. Civil Aeronautics Board,* 684 F.2d 31 (D.C.Cir., 1982); *In the Matter of York International,* 527 F.2d 1061 (9th Cir., 1975); *In re Public Service Company of New Hampshire,* 88 B.R. 521 (Bankr.D.N.H.1988).